[PRIZE. PIRATICAL AGGRESSION. LAWFUL COMMISSION. PROBABLE CAUSE.]

## The PALMYRA, ESCURRA, Master.

A question of probable cause of seizure, under the Piracy Acts of the 3d March, 1819, ch. 75. and the 15th of May, 1820, ch. 112.

In such a case, although the crew may be protected by a commission *bona fide* received, and acted under, from the consequences attaching to the offence of piracy, by the general law of nations, although such commission was irregularly issued; yet, if the defects in the commission be such as, connected with the insubordination and predatory spirit of the crew, to excite a justly founded suspicion, it is sufficient, under the act of Congress, to justify the captors for bringing in the vessel for adjudication, and to exempt them from costs and damages.

Although probable cause of seizure will not exempt from costs and damages, in seizures under mere municipal statutes, unless expressly made a ground of justification by the law itself, this principle does not extend to captures *jure belli*, nor to marine torts generally, nor to acts of Congress authorizing the exercise of belligerent rights to a limited extent, such as the Piracy Acts of the 3d of March, 1819, c. 75. and the 15th of May, 1820, c. 112

VOL. XII.

APPEAL from the Circuit Court of South Carolina.

This was a libel of information under the act of Congress of the 3d of March, 1819, c. 75. entitled, " An act to protect the commerce of the United States, and punish the crime of piracy," continued in force by the act of the 15th of May, 1820, c. 112. The libel was filed by the District Attorney, as well in behalf of the United States, as of the captors; and alleged that the brig Palmyra, *alias* the Panchita, was a vessel, from which a piratical aggression, search, depredation, restraint, and seizure, had been attempted and made, upon the high seas, in and pon the schooner Coquette, a vessel of the United States, and of the citizens thereof, and in and upon the master, officers, and crew of the said schooner Coquette, citizens of the United States; and in and upon the Jeune Eugenie, a vessel of the United States, and of the citizens thereof, and in and upon Edward L. Coffin, the master, and the officers and crew of the said vessel, being citizens of the United States; and also in and upon other vessels of the United States, their officers and crews, citizens of the United States; and in and upon other vessels of various nations, states, and kingdoms, their officers and crews, citizens and subjects of the said states and kingdoms. The vessel in question was an armed vessel, ostensibly cruising as a privateer, under a commission from the King of Spain, and was captured on the high seas, on the 15th of August, 1822, by the United States' vessel of war the Grampus, commanded by Lieutenant Gregory, after a short resistance, and receiving a fire from the Grampus, by which one man was killed, and six men were wounded. The captured vessel was sent into the port of Charleston, South Carolina, for adjudication. A libel was filed, and a claim interposed; and upon the proceedings in the District Court, a decree was pronounced, restoring the brig to the claimants, without damages for the capture, injury, or detention. From this sentence, an appeal was interposed by both parties to the Circuit Court; and upon the hearing in that Court, a decree was pronounced affirming so much of the decree as acquitted the brig, and reversing so much of

it as denied damages; and the Circuit Court proceeded finally to award damages, to the amount of 10,288 dollars and 58 cents. From this decree an appeal was interposed in behalf of the United States and the captors, to the Supreme Court. The cause coming on to be heard in this Court, at February term, 1825, it not appearing that there had been any final decree in the Circuit Court, ascertaining the amount of damages, the cause was dismissed.[a] But at the last term, it being discovered that in point of fact there had been a final award of damages, which was omitted by mistake in the transcript of the record certified by the Clerk of the Court below, this Court, on motion of the appellants, ordered the cause to be reinstated.

At the hearing in the Court below, it appeared that the commission of the Palmyra was numbered 38, and entitled in the margin, " *Real Passaporte de Corso para los Mares de Indias;*" that is, " *A royal cruising passport for the Indian seas.*" The great seal of Spain was affixed to it, and it was signed with the royal sign manual with the usual formula : " *Yo el Reg.*" It was afterwards countersigned by the Secretary of State and Marine Affairs, and dated at Madrid, the 10th of February, 1816. The blanks in the passport or commission, were filled up to Don Pablo Llanger, an inhabitant of Cadiz, to arm for war his Spanish *schooner* (*Goleta*) called the Palmyra, *of ninety-three tons,* one twelve pound cannon, and eight carronades, ten pounders, with a crew of one hundred men. A printed note on the back of the commission, signed by Juan Dios Robiou, lieutenant in the national navy, and captain of the port of Porto Rico, dated on the 5th of February, 1822, renewed the commission in favour of *Llanger, as captain* of the Palmyra, for a new cruise of three months, it having been originally granted for the term of three months, which had expired. The vessel, on board of which the commission was found, was in fact a *brig of one hundred and sixty tons, commanded by Captain Escura.* Various testimony was taken as to the

S. C. 10 *Wheat. Rep. 502.*

acts of piracy committed by the Palmyra upon the Coquette and the Jeune Eugenie, as to the insubordination and predatory spirit of the crew of the Palmyra, and as to the nature and circumstances attending the encounter between the Palmyra and the Grampus, which gave rise to a question of fact in respect to the justifiableness of the cause of capture. But it has not been thought necessary to analyse the testimony, as the most material facts are stated in the opinion of the Court.

*Jan.* 9*th.*  The *Attorney General*, and Mr. *Hayne*, for the appellants, argued, that the Palmyra was not lawfully and regularly commissioned ; and that, admitting the vessel was so commissioned, she had forfeited her character by the misconduct of the officers and crew, and acquired that of a pirate.

1. A commission to cruise is a delegated authority, and can only proceed from the sovereign.[a]  Subordinate agents may be employed to execute the will of the sovereign in that respect, but the actual delegation of the power must clearly appear.  The original commission being issued by the King of Spain to Captain Llanger, for a cruise of three months, which had expired, the commission was *functus officio*.  Its subsequent extension to Captain Escura, by the Port Captain of Porto Rico, was without any authority from the King for that purpose.

2. A commission to cruise is given, not to the armed *vessel*, but to the *officer* commanding the vessel ; and though the officer next in rank may, in his absence, succeed to his rights, he does so by becoming captain for the time being. It has, therefore, been expressly determined, that if in the absence of the master, a privateer makes a capture, it is not such a capture as vests a prize interest in the captors, but it must be condemned as a droit.[b]

2. It has become an established rule, and made necessary

a *Martens, Privateers,* 11—38.  2 *Azuni,* 353. *Mr. Johnson's translation.*
b 3 *Rob.* 195. 224.  5 *Rob.* 280.

by the laws of all nations, that every privateer, before she is permitted to cruise, shall give *security*, and this fact must appear on the face of the commission itself.[a] Such security is required by the laws of Spain, but was not given in this case.

3. The learned counsel entered into a minute examination of the facts, to show that the vessel ought to have been condemned as a piratical vessel, under the law of nations, or as having committed a piratical aggression under the acts of Congress, which were in conformity with the law of nations. They then proceeded to argue, that however this might be, there was, at all events, probable cause for the capture of the Palmyra, and for sending her in for adjudication. Probable cause had been defined to be less than evidence which would justify condemnation. In its legal sense, it means a seizure made under circumstances which warrant suspicion.[b] The term must receive the same exposition in matters of prize, and is applied to a captor as well as a seizor.[c] In all captures made *jure belli*, circumstances of strong suspicion will justify the captors, and the same circumstances must equally justify a seizure made under this act of Congress, which authorizes hostilities against those, who, by their conduct, have acquired the piratical character, and forfeited the protection of their own country. Indeed, this must now be considered as a settled principle in this Court, since the decision of the case of the *Marianna Flora ;*[d] every circumstance of which would find its parallel in the present case. The Court having determined that it will not look beyond the act of Congress for a description of piratical vessels, and that no damages will be given for bringing in for adjudication, after capture of a vessel falling within that description, if the seizing officer

a *Wheat. Capt.* 41. 320.　*Martens*, 4. 6.　*Bynk. Q. J. Pub. Duponceau's transl.* 147.　2 *Bro. Civ. and Adm. Law*, 339;　*Molloy*, 49.

b Locke. v. The United States, 7 *Cranch*, 339. 348.

c 1 *Mason's Rep.* 27.　3 *Cranch*, 458. 491.

a 11 *Wheat. Rep.* 1.

1827.

The
Palmyra.

acted *bona fide* in the honest discharge of his duty under the law, and the instructions of the President, although the Court itself might be of opinion that he ought to have released the vessel, nothing remains but to apply these principles to the facts of the present case. The same doctrine had also been laid down by Sir W. Scott, in a case which this Court cite with approbation in the judgment in the *Marianna Flora*.[a]

The learned counsel further insisted, that the seizing officer was fully justified in capturing, and sending in for adjudication, the Palmyra, upon the following, among other grounds. 1. Because the vessel had, in the very words of the statute, committed various acts " of piratical aggression, search, restraint, depredation, and seizure," on American, and other vessels. 2. Because the conduct of the vessel, in searching American ships, in violation of the treaty between the United States and Spain, and all the other circumstances of the case, warranted the worst suspicions respecting her character and conduct. 3. Because the conduct of the commander of the Palmyra, after the capture, and the unsatisfactory explanations given by him of the above circumstances, confirmed those suspicions ; and the seizing officer not being, according to his instructions, " satisfied that she was acting under a regular commission, and not piratically," he was bound to send her in for adjudication.

Mr. *Tazewell*, for the respondents, argued, (1.) That the Court had no authority to reinstate the cause, after it was dismissed at a former term : 1. Because it might operate to the prejudice of the sureties, to whom the property had been delivered, on bail, in the Court below ; and, 2. Because the cause might be heard in this Court upon the appeal, in respect to the sentence of restitution, that being the only decree in which the United States had any interest as a party ; and that, as to damages, the captors were the only persons responsible for damages, and they alone had a right

a  The Louis. 2 *Dodson's Adm. Rep.* 210.

of appeal respecting that subject; so that the original cause had thus become divided into two causes, in which each party was an actor.

2. The learned counsel also insisted that the libel was defective, in not charging with sufficient precision the particular acts of piratical aggression, and in omitting to allege a previous prosecution and conviction of the captured persons of the crime of piracy, which, it was insisted, was an essential prerequisite to the proceeding *in rem*.

3. As to the general merits, he argued with great minuteness and ability upon the facts, to show that the vessel had not been guilty of a piratical aggression, within the meaning of the acts of Congress, and that no such probable cause existed as justified the captors in the original seizure, and in bringing in the vessel for adjudication. The evidence was not sufficient to establish any acts of sea robbery, constituting a piratical character, or general habit of piracy; and so far from having committed a piratical aggression on the Grampus, the Palmyra had merely acted in self defence, the avowed purpose of Lieutenant Gregory being to capture her upon suspicion. The case presented, was that of a hostile attack made by a vessel of war of the United States on a foreign vessel, known to be regularly commissioned, and sent in for adjudication after her character was satisfactorily explained. But even supposing there was probable cause for the seizure and detention, that would not excuse, unless it was followed by an actual condemnation. Probable cause will not excuse from remunerative damages, in any case, unless of a capture *jure belli*, or where it is expressly provided as a justification by some municipal law. This doctrine was clearly recognised by the Court in the case of the *Apollon.*[a]

Mr. Justice STORY delivered the opinion of the Court.

This is the case of a proceeding *in rem*, by a libel of information founded on the act of Congress of the third of

a 9 *Wheat. Rep.* 362.

*1827.*

The
Palmyra.

*Jan. 15th.*

March, 1819, ch. 75. as continued in force by the act of Congress of the 15th of May, 1820, ch. 112. The second section of the former act authorizes the president " to instruct the commanders of public armed vessels of the United States, to seize, subdue, and send into any port of the United States, any armed vessel or boat, or any vessel or boat, the crew whereof shall be armed, and which shall have attempted or committed any piratical aggression, search, restraint, depredation or seizure, upon any vessel of the United States, or of the citizens thereof, or upon any other vessel." The fourth section declares, " that whenever any vessel or boat *from which* any piratical aggression, search, restraint, depredation, or seizure, shall have been first attempted or made, shall be captured and brought into any port of the United States, the same shall and may be adjudged and condemned to their use, and that of the captors, *after due process and trial,* in any Court having admiralty jurisdiction, and which shall be holden for the district into which such captured vessel shall be brought, and the same Court shall thereupon order a sale and distribution thereof accordingly, and at their discretion."

The brig Palmyra is an armed vessel, asserting herself to be a privateer, and acting under a commission of the King of Spain, issued by his authorized officer at the Island of Porto Rico. She was captured on the high seas on the 15th of August, A. D. 1822, by the United States vessel of war Grampus, commanded by Lieutenant Gregory, after a short resistance, and receiving a fire from the Grampus, by which one man was killed, and six men were wounded. She was sent into Charleston, South Carolina, for adjudication. A libel was duly filed, and a claim interposed ; and upon the proceedings in the District Court of that district, a decree was pronounced by the Court, that the brig be acquitted, without any damages for the capture, injury, or detention. From this decree an appeal was made, by both parties, to the Circuit Court; and upon the hearing in that Court, where, for the first time, the officers of the privateer were examined as witnesses, the Circuit Court pronounced a decree, affirm-

ing so much of the decree of the District Court, as acquitted the brig, and reversing so much of it as denied damages, and proceeded finally to award damages to the claimants, to the amount of 10,288 dollars and 58 cents. From this decree there was an appeal, interposed on behalf the United States and the captors, to the Supreme Court. The cause came on to be heard upon this appeal, at February term, 1825, and upon inspection of the record, it did not then appear that there had been any final decree, ascertaining the amount of damages. The Court were of opinion, that if there had been no such decree, the case was not properly before the Court upon the appeal, there not being any *final* decree, within the meaning of the act of Congress. The Court considered, that the damages were but an incident to the principal decree; that the cause was but a single one; and that the cause could not, at the same time, be in the Circuit Court for the purpose of assessing damages, and in this Court upon appeal, for the purpose of an acquittal or condemnation of the vessel. The questions indeed were different; but the cause was the same. Upon this ground, the appeal was dismissed. But at the last term of the Court, it appearing that in point of fact there had been a final award of damages, and that the error was a mere misprision of the clerk of the Circuit Court in transmitting an imperfect record, the Court, upon motion of the appellants, at the last term, ordered the cause to be reinstated.

It is now contended, that this Court had no authority to reinstate the cause after such a dismissal; 1. Because it may operate to the prejudice of the stipulators or sureties, to whom the privateer was delivered, upon stipulation, in the Court below; and, 2. Because the cause was capable of being heard in this Court upon the appeal in respect to the decree of acquittal, that being the only decree in which the United States had any interest as a party; and that as to the damages, the captors were the only persons responsible for damages, and they alone had a right of appeal respecting the same; so that by operation of law, the cause had be-

*margin notes:* 1827. The Palmyra.

*Whether this Court had authority to reinstate the cause.*

1827

The
Palmyra.

come divided into two separate and distinct causes, in which each party was an actor.

This Court cannot concur in either objection. Whenever a stipulation is taken in an admiralty suit, for the property subjected to legal process and condemnation, the stipulation is deemed a mere substitute for the thing itself, and the stipulators liable to the exercise of all those authorities on the part of the Court, which it could properly exercise, if the thing itself were still in its custody. This is the known course of the Admiralty. It is quite a different question, whether the Court will, in particular cases, exercise its authority, where sureties on the stipulation may be affected injuriously. That is a subject addressed to its sound discretion. In the present case, there was no ground for surprise or injury to the stipulators, or indeed to any party in interest. If there had been no final award of damages, the cause would not have been properly before this Court, and the appeal itself, being a nullity, would have left the cause still in the Circuit Court. But as such an award was made, the appeal was rightfully made; and the dismissal, being solely for a defect of jurisdiction apparent on the record, and founded on a mistake, constituted no bar to a new appeal, even if a general dismissal might. The appeal then might, at any time within five years, have been lawfully made, and have bound the parties to the stipulation, to all its consequences The difference between a new appeal, and a reinstatement of the old appeal, after a dismissal from a misprision of the clerk, is not admitted by this Court justly to involve any difference of right as to the stipulators. Every Court must be presumed to exercise those powers belonging to it, which are necessary for the promotion of public justice; and we do not doubt that this Court possesses the power to reinstate any cause dismissed by mistake. The reinstatement of the cause was founded, in the opinion of this Court, upon the plain principles of justice, and is according to the known practice of other judicial tribunals in like cases.

The other objection has not, in our opinion, a more solid

foundation. The libel was filed by the District Attorney, as well in behalf of the United States, as of the captors, and prayed, as usual, a condemnation of the vessel, and distribution of the proceeds. This fact is noticed for the purpose of answering the observation made at the bar, as to the parties to the libel. It has been supposed, that the United States, and the captors, are to be deemed severally libellants, having distinct rights, both of prosecution and appeal. But this proceeds upon a mistake. In every case of a proceeding for condemnation, upon captures made by the public ships of war of the United States, whether the same be cases of prize, strictly *jure belli*, or upon public acts in the nature of captures *jure belli*, the proceedings are in the name and authority of the United States, who prosecute for themselves as well as for the captors. The captors cannot, without the authority of the government, proceed to enforce condemnation. The suit is, in form and substance, a proceeding by and in the name of the United States, for the benefit of all concerned. And whether the question respect the point of condemnation, or of damages, the United States have a right of appeal coextensive with the whole matter in litigation, and may interpose their protection to guard their agents and officers against injury and damages. These agents and officers are, indeed, in a certain sense, parties to the suit, as the seizing officer is in cases of mere municipal seizures; and when the claimant makes himself, by a demand of damages, an actor in the suit, no doubt exists that the Court may proceed to decree damages against them, and thus entitle them to a separate right of appeal, if the government should feel that it had no further interest to pursue the suit. But still the right to damages must always be dependant upon the question of condemnation or acquittal, for it can never be successfully contended, that if a condemnation is finally adjudged, a decree for damages can be maintained. And, on the other hand, in a case of acquittal, the whole circumstances of the case must be taken into consideration, in order to ascertain that the case is one which justifies an award of damages.

1827.

The Palmyra.

The entire cause regularly before the Court.

In the present case, there was an appeal entered by the Dis- trict Attorney for the United States, and also for the cap- tors, from the decree of the Circuit Court. If this decree was final, such an appeal brought up the whole cause as to all he parties ; and would, in point of law, have produced the same effect, if in form the appeal had only been in the name of the United States. If the decree was not final, (as upon the original record it appeared to this Court not to be,) then it was void as to all parties. Either way, then, there never was any separation of the parties libellants, so as to give rise to the point of separate independent causes. We are, then, of opinion, that the whole cause is now right- fully before us.

It is contended on behalf of the appellees, that the pre- sent suit cannot be maintained, because the libel itself is fatally defective in its averments. It is said to be too loose, inartificial and general in its structure, to give a just foun- dation for any judgment of condemnation. If this were admitted to be true, the only effect would be, supposing the merits on the evidence appeared to be in favour of the libellants, that the Court would, according to its known course of practice, remand the cause to the Circuit Court, with directions to allow an amendment of the libel, and ul- terior proceedings consequent thereon. But there is assert- ed to be another fatal defect in the averments of the libel, which is incapable of being cured, because it cannot be es- tablished in point of fact ; and that is, that the offenders are not alleged to have been convicted upon any prosecution *in personam*, of the offence charged in the libel. The argu- ment is, that there must be a due conviction upon a prose- cution and indictment for the offence *in personam*, averred and proved, in order to maintain the libel *in rem*.

How far the
strict rules of
the · common
law, as to
pleading in
criminal cases,
are applicable
to informa-
tions *in rem*.

In respect to the first objection, it must be admitted, that the libel is drawn in an inartificial, inaccurate, and loose manner. The strict rules of the common law as to crimi- nal prosecutions, have never been supposed by this Court to be required in informations of seizure in the Admiralty for forfeitures, which are deemed to be civil proceedings *in*

*rem.* Even on indictments at the common law, it is often sufficient to state the offence in the very terms of the prohibitory statute; and the cases cited by the Attorney General are directly in point. In informations in the Exchequer for seizures, general allegations bringing the case within the words of the statute, have been often held sufficient. And in this Court it has been repeatedly held, that in libels *in rem*, less certainty than what belongs to proceedings at the common law, will sustain a decree of condemnation, if the words of the statute are pursued, and the allegations point out the facts, so as to give reasonable notice to the party to enable him to shape his defence. There is, indeed, in Admiralty proceedings, little ground to insist upon much strictness of averment, because, in however general terms the offence may be articulated, it is always in the power of the Court to prevent surprise, by compelling more particular charges as to the matters intended to be brought forward by the proofs. In general, it may be said, that it is sufficient in libels *in rem*, for forfeitures, to allege the offence in the terms of the statute creating the forfeitures. There may be exceptions to this rule, where the terms of the statute are so general as naturally to call for more distinct specifications. Without pretending to enumerate such exceptions, let us look at the allegations in the amended libel in the present case. It charges, " that the said brig, called the Palmyra, &c. was, and is, a vessel from which a piratical aggression, search, depredation, restraint, and seizure, has been first attempted and made, to wit, upon the high seas, in and upon the schooner Coquette, a vessel of the United States, and of the citizens thereof, and in and upon the master, officers, and crew of the said schooner Coquette, citizens of the United States; and also in and upon the Jeune Eugenie, a vessel of the United States, and of the citizens thereof, and in and upon Edward L. Coffin, the master, and the officers and crew of the said vessel, being citizens of the United States, and *also in and upon other vessels of the United States, their officers and crews, citizens of the United States, and in and upon other vessels of various nations, states and*

General rule as to libels *in rem.*

1827.

The
Palmyra.

*kingdoms, their officers and crews, citizens and subjects of said states and kingdoms."* Now, whatever may be said as to the looseness and generality, and consequent insufficiency of the latter clauses of this allegation, the former specifying the Coquette and Jeune Eugenie, (upon which alone the proofs mainly rely for condemnation,) have, in our opinion, reasonable and sufficient certainty. It was not necessary to state in detail the particular acts constituting the piratical aggression, search, depredation, restraint, or seizure. The general words of the statute are sufficiently descriptive of the nature of the offence; and the particular acts are matters proper in the proofs. We may, then, dismiss this part of the objection.

How far a previous prosecution *in personam* is necessary to found the proceeding *in rem.*

The other point of objection is of a far more important and difficult nature. It is well known, that at the common law, in many cases of felonies, the party forfeited his goods and chattels to the crown. The forfeiture did not, strictly speaking, attach *in rem;* but it was a part, or at least a consequence, of the judgment of conviction. It is plain from this statement, that no right to the goods and chattels of the felon could be acquired by the crown by the mere commission of the offence; but the right attached only by the conviction of the offender. The necessary result was, that in every case where the crown sought to recover such goods and chattels, it was indispensable to establish its right by producing the record of the judgment of conviction. In the contemplation of the common law, the offender's right was not devested until the conviction. But this doctrine never was applied to seizures and forfeitures, created by statute, *in rem,* cognizable on the revenue side of the Exchequer. The thing is here primarily considered as the offender, or rather the offence is attached primarily to the thing; and this, whether the offence be *malum prohibitum,* or *malum in se.* The same principle applies to proceedings *in rem,* on seizures in the Admiralty. Many cases exist, where the forfeiture for acts done attaches solely *in rem,* and there is no accompanying penalty *in personam.* Many cases exist, where there is both a forfeiture *in rem* and a personal pe-

nalty: But in neither class of cases has it ever been decided that the prosecutions were dependent upon each other. But the practice has been, and so this Court understand the law to be, that the proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam.* This doctrine is deduced from a fair interpretation of the legislative intention apparent upon its enactments. Both in England and America, the jurisdiction over proceedings *in rem*, is usually vested in different Courts from those exercising criminal jurisdiction. If the argument at the bar were well founded, there could never be a judgment of condemnation pronounced against any vessel coming within the prohibitions of the acts on which the present libel is founded; for there is no act of Congress which provides for the personal punishment of offenders, who commit " any piratical aggression, search, restraint, depredation or seizure," within the meaning of those acts. Such a construction of the enactments, which goes wholly to defeat their operation, and violates their plain import, is utterly inadmissible. In the judgment of this Court, no personal conviction of the offender is necessary to enforce a forfeiture *in rem* in cases of this nature.

Having disposed of these questions, which are preliminary in their nature, we may now advance to the consideration of those which turn upon the merits of the cause. These questions are, 1. Whether the present be, upon the facts, a case for condemnation; and, if not, 2. Whether it be a case for remunerative damages, for vindictive damages are and must be disclaimed.

Upon the first point, it is unnecessary to go into any examination at large of the various facts preceding and accompanying the capture, because the Judges are divided in opinion; and consequently, according to the known practice of the Court, the decree of the Circuit Court, so far as it pronounced a decree of acquittal, must be affirmed.

In respect to the second point, we are all of opinion that the case is clearly not a case for damages. The whole circumstances present such well founded grounds for suspicion

1827.

The Palmyra.

Question of damages.

of the piratical character and conduct of the privateer, as required Lieutenant Gregory, in the just exercise of his instructions from the President, under the acts of Congress, to subdue and send her in for adjudication. That her crew were guilty of plunder from the Coquette and the Jeune Eugenie, is established by proofs entirely competent and satisfactory. Her exercise of the right of search on these vessels was irregular and unjustifiable, and indicated on the part of the boarding officers no disinclination to petty thefts, if they avoided forcible robbery. Her commission is itself liable to much suspicion and criticism. It varies essentially in the description of the rig, the size, and the denomination of the vessel from that on board of which it is found. It purports to be for a schooner of 93 tons, under the command of Don Pablo Llanger; it is found on board of a brig of 160 tons, commanded by Captain Escurra. It was originally granted for a three months' cruise, which had expired; and it purports to be renewed by the Port Captain of Porto Rico, a subordinate agent of the King of Spain, for a new cruise, by an endorsement on it, without any known authority. We do not advert to these circumstances to establish the position that the commission was utterly void, or rendered the exercise of belligerent rights piratical. Whatever may be the irregularities in the granting of such commissions. or the validity of them, so far as respects the King of Spain, to found an interest of prize in the captors, if the Palmyra *bona fide* received it, and her crew acted *bona fide* under it, it ought, at all events, in the Courts of neutral nations, to be held a complete protection against the imputation of general piracy. But the defects of the commission, connected with the almost total want of order and command on board of the privateer, and the manifest insubordination, and predatory spirit of the crew, could not but inflame to a high degree every other just suspicion. In short, taking the circumstances together, the Court think that they presented, *prima facie*, a case of piratical aggression, search, restraint, and depredation, within the acts of Congress, open to explanation indeed, but if unexplained,

pressing heavily on the vessel for the purpose of forfeiture. Lieutenant Gregory, then, was justifiable in sending her in for adjudication, and has been guilty of no wrong calling for compensation.

*1827.*

*The Palmyra.*

It has been argued at the bar, that probable cause of seizure in this case constitutes no ground of defence against the claim of damages. It has been truly stated as the settled doctrine of this Court, that in cases of seizures under mere municipal laws, probable cause, unless so made by statute, constitutes no ground for denying damages, or justifying the seizure. But it is supposed, that probable cause is not an excuse or justification of any seizure or capture, except in cases *jure belli ;* and the case of *The Apollon,* in this Court, (9 *Wheat. Rep.* 362.) is relied on to establish this position. That case contains no doctrine leading justly to any such conclusion. It was a case of seizure under our revenue laws, and, in the opinion of the Court, the point is examined how far probable cause constituted, in that case, a ground to exempt from damages. On that occasion the Court said, that the argument had not distinguished between probable cause as applied to cases of capture *jure belli,* and as applied to cases of municipal seizures; and then proceeded to state the distinction. There was no intimation, that in cases of marine torts generally, or under laws authorizing the exercise to a limited extent of belligerent rights, or *quasi* belligerent rights, probable cause might not be a sufficient excuse. In the case of the *Marianna Flora,* at the last term, (11 *Wheat. Rep.* 1.) the very point was before the Court, and it was in that case held, that probable cause was a sufficient excuse for a capture under circumstances of hostile aggression at sea. Indeed, in cases of marine torts arising under the general maritime law, probable cause often is a complete excuse for the act, and always goes in mitigation of damages. In the Admiralty, the award of damages always rests in the sound discretion of the Court, under all the circumstances. The case of the *St. Louis,* in 2 *Dods. Rep.* 210. is a strong illustration of the doctrine. But, in cases like the present, where the public armed ships

*Probable cause of seizure a bar to the claim for damages.*

Vol. XII. 3

of the United States are authorized to make captures to a limited extent, the authority so exercised by them must be deemed to stand upon the same analogy as captures strictly *jure belli.* And the doctrine of the prize courts as to the denial of damages, where there is, probable cause for the capture, furnishes the proper rule to govern the discretion of the Court. We are then of opinion, that in the present case there was strong probable cause for the capture, and that the decree of the Circuit Court, so far as it awards damages to the claimants, ought to be reversed.

Objection to
the testimony
of the seizing
officer waived
in the Court
below.

It remains only to remark upon one or two points made against the competency of some of the testimony in the cause. It is objected, that Lieutenant Gregory is not a competent witness, because he is, notwithstanding his release of his interest as captor, interested to defeat the claim for damages. However well founded this objection may be as to his competency on the point of damages, having been admitted both in the District and Circuit Courts, as a witness, without objection, we think there was a waiver of the objection, and it cannot now be insisted on. As to the depositions of Captains Souther and Coffin, they were taken under commissions duly issued from the Circuit Court according to the rule of this Court, and are, therefore, admissible upon the strictest principles.

DECREE. This cause came on, &c. On consideration whereof, it is ADJUDGED, ORDERED, and DECREED, that so much of the decree of the Circuit Court as decrees restitution of the brig Palmyra to the claimants, be, and the same is, hereby affirmed : and that so much of the decree of the said Circuit Court as awards damages to the claimants, be, and the same is, hereby REVERSED and ANNULLED ; and it is further ORDERED, that said cause be remanded to said Circuit Court for further proceedings according to law.