### Thomas J. Chambers vs. Henry Hodges — Error from Liberty County.

The jurisdiction of this court is exclusively appellate, but its revisory power is to be exerted, not over its own judgments, but over those of inferior jurisdiction. [9 Tex. 300.]

When the judgment of this court is entered, its minutes authenticated as a record, and the term closed, the court has no further power over the decree for the purpose of revision or modification upon the merits. The rights therein adjudicated are irrevocably concluded and established. [6 Tex. 76; 10 Tex. 127.]

This limitation upon the authority of the court does not prevent the correction of clerical errors or mistakes, or defects of form, or the addition of such clause as may be necessary to carry out the judgment of the court or to declare a judgment null and void which was rendered in a case not legally before the court. [9 Tex. 109; 19 Tex. 321; 25 Tex. Sup. 261.]

The want of proof of notice to the defendant in error is cured by his voluntary appearance in this court.

Where there are no bills of exception, statements of facts nor error suggested or apparent on the record, it is the duty of the counsel for the appellee or defendant in error to suggest delay; and even should he omit to do so, the court will usually, under such circumstances, award the damages authorized by law in cases of frivolous appeal.

The transcript of the record in this case was filed with the clerk of the supreme court on the 11th January, 1844. On the 14th of April, 1847, the judgment of the court below was affirmed, with ten per cent. damages. At the next ensuing term of the court, on the 17th March, 1848, the plaintiff in error filed the following application for a rehearing:

This cause was brought up to the supreme court on writ of error from the district court of Liberty county. The first transcript was sent up by the clerk below to the June term of the supreme court for 1844, by mail; and the plaintiff in error, T. Jefferson Chambers, who now appears before this honorable court to apply for a review of the cause, had no opportunity to examine said transcript until it reached this court at that term, when he discovered in it great deficiencies, suggeste the diminution to the court, and applied for a writ of *certi rari* to complete it, and at the same term for a citation or *scir facias* to the defendant in error [14 Peters, 147; 1st United States Digest, p. 644 and § 409]; which last, as it appears from the minutes of the court, was awarded, but not the *certiorari;*

still, the impression was made upon this applicant, and upon the clerk, as I am informed by him, and consequently upon the court also, as it is believed, that the *certiorari* issued, probably from the similarity of the appearance of the word "citation" to "*certiorari*," as written in the minutes of the court. Thus the cause was continued until the last term of the court, when, no amended and complete transcript of the record having come up, the application for a *certiorari* was renewed by one of the attorneys employed by this applicant to attend to this cause, by a motion duly filed therein. It would not have been proper for this applicant to have filed any brief in the cause or to have made any assignment of errors, until the entire record· was before the court; for the defendant in error might have replied *in nullo est erratum in recordo*, and so the case would have gone off on a partial hearing; so that all the appellant in error could properly do, was to insist upon his writ of *certiorari* to complete the record, which was done. Nevertheless, afterwards, at the same term of the court, the attorney of the defendant in error, intending to take an unfair advantage, as this applicant believes, seeking to surprise the plaintiff in error, and impose upon the court, caused (the plaintiff in error and his attorneys being temporarily absent from the court) an admission to be entered on the minutes of the court, that the defendant in error had been served with the citation, no return of which having yet been made into court; and so he took the case up, falsely representing it to be a delay case; and as such, it would seem, it was thus disposed of, with but little more than half the record before the court, and the renewed application for a *certiorari*, it is supposed, was wholly overlooked. And by these subtle devices, the attorney of the defendant in error procured an award of ten per cent. damages upon the judgment below, against this applicant, and this applicant had no notice, until a short time before the present term of this court, of its decision, so that it was impossible for him to apply for a review at the last term; he therefore now, at this term of the court, moves that a review of the cause be had, in order

that justice may be rendered therein, which he would respect-fully proceed to show has not been done.

For this purpose, this applicant would premise that this cause is still clearly under the control and in the breast of this hon-orable court; for, by a mistake of the clerk, the mandate of this court was dated on the 25th day of June, 1848, a day not yet arrived, and therefore the mandate is wholly inoperative, and, it is believed, a total nullity. And the action itself of the court must be viewed rather in the light of a simple award than a solemn judgment, as it was taken without a full hear-ing and consideration of the merits of the cause, and no formal written opinion was made out upon it and enrolled. It was in the nature of a judgment by default, in a cause not fairly and fully before the court, obtained, as it appears, by the misrep-resentation and trickery of the opposite party, favored by a mistaken impression of the clerk of the court, as this applicant believes, and consequently of the court itself.

The transcript of the record below, upon which this cause was disposed of by this honorable court, was incomplete in a material respect, as will abundantly appear from the certified transcript now herewith presented, marked (B), which has been since obtained, though without the aid and authority of a writ of *certiorari;* and the new matter now presented forms a new, distinct, complete and legitimate cause for the determination of this court, whereon it may pronounce a formal, solemn and irrevocable judgment; whilst the award of the court as by default, at the last term, was based upon a fragment, the record of no suit whatever; and it is believed the action of the court thereon, then had, must be taken as an absolute nullity.

In order that the impression that this cause was brought up for purposes of delay may be completely effaced, this applicant prays that the part of the new transcript herewith presented, beginning with the petition of this applicant to the court below for a new trial, on page 10, and ending with the decision of the judge, P. C. Jack, on page 17, may be here read.

And in order not only to remove all impression that this cause was brought up for delay, but to show that it was one of peculiar enormity, in which great injustice was done, this

applicant asks leave to represent a few facts connected with the case, which, although they may not appear conclusively from the records, throw light upon them, and receive corroboration from them. The brother of this applicant, mentioned in the petition just referred to, arrived in Texas towards the close of the year 1840, and being a lawyer of considerable experience and great discretion, he became the agent of this applicant, with full powers to transact his business and defend his suits and interests. It will be observed by the court that the name of G. S. Thomas disappears from the records as agent about this time, and does not reappear until the fall of 1842, when he comes forward to waive the incompetency of the judge and confess judgment. In the mean time he had abandoned that part of the country; ceased to be agent for attending to the suits of this applicant — never having held any but the limited powers expressed in the letter attached to the petition just referred to in the record, and had fallen into habitual intoxication — subject to frequent fits of *mania a potu*. In this shattered condition of his nature, the plaintiff in the suit below (as this applicant is informed and believes), fraudulently meditating an iniquitous advantage, induced him to go into court, waive the incompetency of the judge, who, as it appears from the record, was interested in the suit as counsel, and confess a judgment for an amount greater than said plaintiff was entitled to, by his own showing in his original petition, if fully allowed, and against which said Thomas had twice sworn, and knew there were just defenses. Prior to this confession of judgment, towards the close of the year 1841, the above mentioned brother and agent of this applicant departed this life and left his business defenseless. During this year, although (as it appears from the records) a competent judge, the Hon. Richard Morris, presided at the court, no effort was made by the plaintiff below to press the suit to a hearing. The above mentioned brother of the defendant then lived, and would have exposed the injustice of the demand. About this time, a formidable combination was entered into, as this applicant verily believes, co-extensive with his entire interest in this state, to crush and ruin him by multiplying litigation

upon him, and in his absence insidiously propagating calumnies against him. This applicant was represented to have abandoned the country, and to be dead, whilst his correspondence was intercepted, and the whole of his property was lawlessly seized upon and thrown into a condition requiring it to be litigated. Many unjust suits were brought against him, and fraudulent proceedings were had, by which the home of this applicant was sold out and his property recklessly squandered; and the said Thomas, as it is charitably believed, yielding to the misrepresentations and false rumors which were so actively circulated, and being perhaps under the influence of one of the spells of mental aberration to which (it is said) he was often subject, confessed judgment in another suit in addition to the one now in question, for upwards of three thousand dollars against this applicant, when not one cent was owing — representing himself to be the agent of this applicant; and this applicant now holds the written acknowledgment of said Thomas that he never had the slightest authority to confess that or any other judgment against this applicant. And this applicant would respectfully insist that the judge below erred in allowing said Thomas to appear in the absence of the defendant below, and without filing in the suit any power or authority from said defendant, waive the incompetency of the judge and confess judgment, after having twice sworn that there were just defenses to the demand of the plaintiff, for a greater amount than said plaintiff himself claimed to be due in his original petition. The authority to confess judgment is one of the highest and most dangerous trusts that can be confided to an agent; and it should never be permitted to be exercised in any court without the exhibition of the most unquestionable warrant of attorney. To guard against the abuses and frauds which would otherwise be committed by pretended agents, the first legislature of the state of Texas [Laws 1846, p. 393] required the power always to be filed, fortifying and re-enforcing the old English common law upon the subject; and the laws in force at the rendition of the judgment in question were not less careful of the rights and interests of the

absent. From a review of all the enactments of the legislative powers of Texas, for the organization and practice of the courts of justice, down to the time of the rendition of the judgment in question, it seems that the old laws of practice remained in force, with no changes but the modifications made by such acts; and the ancient practice with regard to agents for the prosecution and defense of suits was still in force at that time. The 36th article of the law "for the regulation of the administration of justice in Texas" [Laws of Coahuila and Texas, p. 258], provides that "agents may be appointed in the ordinary way, and *apud acta*, or upon the records of the case, by the litigant's presenting himself in person and appointing an agent to prosecute and conclude the suit in his name, both parties signing the act drawn up." I have given my own translation of the above portion of the article, as that in the book is defective. The word "apoderado" means agent or attorney in fact, as well as attorney at law. With regard to the first part of the article, which provides that "agents may be appointed in the ordinary form," the ancient law required that the agent or attorney to conduct a suit should file in the cause his warrant of attorney, regularly drawn out and duly acknowledged before a notary, specifically setting forth all his powers. [4 Sala, 76 and 81; Escriche Diccionario, p. 32; "Apoderado," p. 541, and "Procurador."] It was, therefore, error to permit the said Thomas to appear in the suit, and still greater to allow him to waive the incompetency of the judge, or to confess judgment, without a power duly filed.

But if the said Thomas had filed a full power to defend the suit, it would still have been error to have permitted him to confess judgment after he had sworn there were just defenses to the demand of the plaintiff; and yet still greater error to allow him to confess a judgment for three hundred dollars, when the plaintiff himself admitted in his petition that he and his family were to work one year for six hundred dollars, and that they only remained five months, which, at most, would only have entitled him to two hundred and fifty dollars. But he actually failed to comply with his contract, except by living

in the house, and upon the substance, of this applicant; and this applicant has been informed, and believes he can prove, that the defendant below has acknowledged, and even boasted, since he obtained his judgment, that he did not perform the work stipulated in his contract, and that he never intended to do so, his only object being a temporary home.

It will be seen by the record that the judgment was rendered at the fall term of the court for 1842; and that the defendant, having just returned to the republic, from which he had been absent, applied at the next term of the court for a new trial; showing that Thomas had no power to confess judgment, and that the plaintiff below had no just claims against him. Under such a showing, it is believed that the law entitled the defendant to a new trial; and the judge having accepted jurisdiction in the case when it would benefit the plaintiff in the suit, had no right, it is believed, to decline it when it would open the door to the defendant to obtain justice. He could not exercise or decline jurisdiction, as it might benefit or not a single party; and his decision was still more clearly erroneous when he refused to grant a writ of error, and placed the defendant under the necessity of going beyond the district to another judge to obtain a mere writ of right. The judge below, therefore, erred in refusing to grant a new trial.

But if the said Thomas had been clothed by the defendant with full powers for the purpose, he could not have clothed the judge below with jurisdiction over the cause; for it was positively prohibited by the law, that a judge should take cognizance of a cause in which he was in any manner interested; consent of the parties could not give him jurisdiction; the cause before him was *coram non judice;* his action thereon was an absolute nullity; and it is confidently believed that the award of the supreme court, resting upon such a basis, will also be considered an absolute nullity, and consequently be recalled. [1st U. S. Digest, 630, § 62, and the cases there cited.]

Therefore, in consideration of all which, the evident injustice done to this applicant below; the manifold errors in the proceedings of the district judge; the mistaken impressions under

which, it is believed, this honorable court disposed of the cause in error at the last term, the cause not being fully and properly before it, this applicant moves and prays the court to review the cause, and grant a hearing thereof which has not yet been had, in order that full justice may be rendered thereon; and that the same may be notified to the court below for its government.

That your honorable court, in the exercise of its combined common law and equity jurisdiction, under its liberal and ample powers to prescribe its own rules of practice, has the right to grant a rehearing, where, from mistake, accident, oversight or any other like cause, justice has not been done, cannot be doubted; and it is believed the condition of the country, its modes of business, and the habits of the bar, require that the time should be extended at least to the next term of the court after that at which the cause for rehearing may arise; and the vastly complicated and conflicting interests of the country, its multifarious and complex laws, and its unformed embryo practice, all demand (as this applicant, with great deference, would urge) that the supreme court should thus keep the door open to right, in order that its dignity, influence and authority may not be impaired by its becoming, in any case, the organ and instrument of injustice. [Raborg vs. Bank of Columbia, 1 Har. & Gill, 238, note; 1st United States Digest, p. 659, § 803; p. 661 and § 851; Miller vs. The Resolution, 2 Dall. 19.] It is confidently hoped and believed that it will always be considered and held in Texas, that the true dignity of its supreme court shall consist in its being the invariable dispenser of unshackled justice, the legitimate issue of the union of common law with the equity principles and practice [Clerk vs. Foster, 2 Tyler, 467]; and that all the antiquated rules of action that would throw obstacles in the way of this grand result, that would prohibit error from being corrected wherever and whenever, in a reasonable and feasible length of time, it may be discovered and manifested, whether it be traceable to the act of God, the oversight of the judges themselves, the clerk, or any extraneous cause, will be disregarded. [1st U. S. Digest, p. 657, § 741; 2 U. S. Digest, p. 164, § 120, and p. 171, § 319.]

But this applicant would most respectfully represent to the court that he is in no need of going beyond the precedents of the courts both of England and the United States to sustain this his application for a rehearing, either according to common law or equity proceedings, by error *coram nobis*, or by review [2 Bacon's Ab. Error, marg. pp. 484, 485; id. Certiorari, p. 468, and forward; 1st Tomlin's Law Dic. Error, p. 652, § 3], because he has clearly shown, as he believes:

First. That the cause is still under the control and within the breast of the court, by a mistake of the clerk in making out the mandate, and the action of the court being only a simple award as by default, without a formal opinion upon the merits of the cause delivered and enrolled. [Waters *vs.* Travis, 8 Johnson, 566; 1st U. S. Digest, p. 644 and § 409.]

Second. The cause below was *coram non judice*, and the action of the court thereon an absolute nullity; the award of the supreme court based thereon must also be a nullity, and should be recalled. [1st U. S. Digest, 630, § 62, and cases there cited.]

Third. The award, it is believed, was obtained from the court by a surprise, and the incorrect representations of the party defendant in error that this was a delay case.

Fourth. By a mistaken impression of the clerk, as it is believed, and consequently of the court, with regard to the *certiorari*, no cause was properly before the court when the award was made, which was based upon a mere fragment of the record; and it is believed the court cannot properly determine a suit without the entire record before it, where a party solicits it.

Fifth. It is believed that the new matter now presented to the court forms a new, distinct and legitimate cause for the full and final consideration and determination of the court; and the former imperfect award must be dependent thereon and controlled thereby. [1st McCord's Chancery Rep. p. 30.]

No power of a court of chancery, it is believed, is more frequently exercised than that which grants relief from injuries growing out of accidents or mistakes, and rehearings, for that

purpose, are amongst the remedies most familiar to it; and it often grants several rehearings in the same cause. In the case of Babow *vs.* Stearle [1st Vernon's Cases, 416], a rehearing to make a discovery was granted after the case had been disposed of by the House of Lords; and in the late cases of Mousley *vs.* Carr, and Fournier *vs.* Paine [8th Condensed English Cases in Chancery, 349, 350], it will be seen that several rehearings were allowed in the same cases after they had been decided by the High Court of Chancery, and by different chancellors.

But if this applicant is right in the position that the mandate of the court is a nullity on account of the mistake in the 'date, and that it stands inoperative without a further action of the court (and this seems conclusive), then all difficulty vanishes from the case; it is still in the breast of the court, and it must correct this mistake before the judgment can be carried into effect. But if it proceeds to correct this mistake, will it not go a little farther, and at least correct that of awarding ten per cent. damages? for it must now be indubitably apparent, from the new transcript presented, that the cause is not such a one as the statute contemplates, where it authorizes ten per cent. damages to be awarded for delay. Various decisions of the supreme court of the United States authorize such corrections to be made, even after the mandates are sent down, and at a subsequent term of the court. And the case of the Bank of the Commonwealth of Kentucky *vs.* Wistar, Price & Wistar [3 Peters, 431] is one directly in point, where the decision was corrected, in respect to the damages awarded, at a subsequent term of the court, after the mandate had issued, but had been held back from the court below, as it seems, by the party interested in having the damages awarded.

But this applicant believes he is warranted in going much farther, and in insisting, as he does most respectfully, for a rehearing, or rather a hearing upon the merits of his cause, which he has never yet had, although he has all along assiduously sought it. As soon as he discovered the defect in the transcript of the cause, he applied to the court for a *certiorari* to the clerk below to complete it; he believed such writ to be necessary to

complete it, and that no amended transcript would be admitted but upon the authority of such writ. Accordingly the application was renewed at the last term of the court, and as it does not appear from the minutes of the court that the writ was ever refused, nor yet that it was ever granted, it is presumed that it was wholly overlooked by a mistaken impression of the clerk, as heretofore suggested, and the case was disposed of in the absence of a material and important part of the record, and without any laches, in that respect, on the part of this applicant. The cause was therefore never properly in court, and therefore the award of the court is believed to be an absolute nullity; and it seems equally clear that it was also an absolute nullity, because it was based upon a nullity — a judgment from a court below, absolutely null and void for the want of power in the party confessing, and jurisdiction in the judge pronouncing it. And in such a case this applicant confidently believes that the supreme court has the highest possible authority for granting a rehearing upon the merits of the cause. The supreme court of the United States, in the case of *Ex parte* Crenshaw [15 Peters, 119], granted a rehearing at a subsequent term of the court, after the mandate had gone down; declared its decree of the former term null and void, and recalled its mandate to the court below, upon the ground that "*the case was not properly before the court*" at the former term, and that "*an accidental circumstance led the court into error in this respect.*" What case could be more exactly in point to support this application? With due deference to the court, this applicant begs to commend this case to the attention and respect of the court as being one of the latest upon the subject, showing the steady advance of the most enlightened court in the world to the high object for which all courts are established — the sure administration of justice, unimpeded by antiquated or uncertain precedents, which would cut them off from the legitimate and essential object of their institution.

This applicant does therefore again pray your honors to grant him a hearing in the premises, in order that the door of justice may be open to him.     T. JEFFERSON CHAMBERS.

Before me, Thomas Green, clerk of the supreme court of Texas, personally appeared the above named T. Jefferson Chambers, and duly swore that the facts set forth in the foregoing application are true, to the best of his knowledge and belief.

THOMAS GREEN,

Clerk Sup. Court Texas.

Austin, 17th March, 1848.

Mr. Chief Justice HEMPHILL, upon the application for a rehearing, delivered the opinion of the court.

An application was made at the last term to have the judgment, rendered in this cause at a former term, reconsidered. And we then stated, in substance, that the question of the authority of this court to reconsider a judgment given at a former term, being for the first time presented, and being important in practice, the application would be granted, in order that the subject might be fully considered, and the question settled for the government of all future causes.

The cause was argued some weeks since by counsel for the defendant in error (the plaintiff not being represented), and we now proceed to deliver the opinion of the court upon the point presented and reserved for consideration.

The jurisdiction of this court is exclusively appellate, but its revisory power is to be exerted, not over its own judgments, but over those of inferior jurisdiction. These it has the power to affirm, reverse and reform, or to remand the cause for a new trial and more definite decision; but the statute has conferred upon it no authority to revise its own judgments upon the merits, or to affect any material modification in any material thing therein determined. There must be some period at which litigation shall cease, and controverted rights be formally disposed of and settled; and this period seems, on principle, to be contemporaneous with the accomplishment of the act for which the power has been exerted. The statute forbids no such conclusion, and we may safely hold that when the judgment of the court is fully settled, its minutes entered and authenticated as a record, and the term is closed, the court has no further power over the decree for the purpose of

revision or modification upon the merits; and that the matters therein disposed of are finally settled, and the rights adjudicated irrevocably concluded and established.

This limitation upon the authority of the court will not prevent the correction of clerical errors or mistakes, or defects of form, or the addition of such clause as may be necessary to carry out the judgment of the court or to declare a judgment null and void which was rendered in a case not legally before the court.

These doctrines are in entire conformity with the principles established in decided cases of the highest authority. In the case *Ex parte* Sibbald *vs.* The United States [12 Peters, 492], it was declared that the supreme court had no power to review their own decisions, whether in a case at law or equity. That no principle was better settled, or of more universal application, than that no court can reverse or annul its own final decrees or judgments for errors of fact or law, after the term in which they have been rendered, unless for clerical mistakes [3 Wheat. 591; 3 Peters, 431]; or to reinstate a cause dismissed by mistake [12 Wheat. 10]; and that no substantial change or modification could be made affecting the judgment in any material thing. To this rule, as a general one applicable to all courts, bills of review in equity and writs of error *coram nobis* at law were stated to be exceptions. That inferior courts could not vary the decree, or examine it for any other purpose than execution, or give any other or further relief, or review it upon any matter decided on appeal for error apparent, or intermeddle with it further than to settle so much as has been remanded. That after a mandate, no rehearing has ever been granted in the House of Lords [4 Dow. P. C. 157]; and, on a subsequent appeal, nothing is brought up but the proceeding subsequent to the mandate. [5 Cranch, 316; 7 Wheat. 58, 59; 10 Wheat. 443.]

In the case of The People *ex relatione* The Attorney General *vs.* The Mayor and Aldermen of the City of New York [25 Wend. 253], an application was made at the next term after the decision, for a rehearing, and the question of the

34

legal and constitutional rights of the court to open and re-
verse its judgments was fully considered; and it was held that:
the court had no legal right, or power, to grant a rehearing·
upon a writ of error after a final judgment has been pronounced.
upon the merits of the case, and has been regularly settled and
entered of record in the form required by law.

It is stated that no rehearing has been granted in the house·
of lords, upon writs of error, for several hundred years past;.
that upon appeals from the court of chancery, the house of
lords exercised the power of granting rehearings down to the
latter end of the 17th century; that since that time, a case had.
not been found in which a rehearing was granted, even in an
equity case, upon the merits.    But in some few cases, mere
defects in form have been corrected, or a new clause added to
the decree, to carry out the judgment of the house of lords
upon the appeal.    In the opinion, reference is made to "Syd-·
ney on·Appeals," and "Palmer's Practice of the House of·
Lords," and it is stated that these writers consider it the settled·
practice in the house of lords for nearly a century and a half.
past, that there can be no rehearing or review of the cause
upon the merits after the minutes of the judgment have been
settled and directed to be entered.    That, according to Sidney,
when the minutes of an order have been read at the table of
the house of lords, it is considered final and unalterable, even
upon appeals from chancery.

In Bernal vs. The Marquis of Donegal, where a mistake, in
drawing up the order on appeal, was corrected, it was said by
Lord Redesdale that the judgment upon the merits could not
be reversed, although from misapprehension of counsel, in sup-
posing that the case would be disposed of upon a matter of·
form merely, the merits of the case had not been fully argued by
such counsel at the hearing.    It was also stated as the uniform
practice of the court of errors in New York, so long as the
writer of the opinion had been a member, to refuse an appli-
cation for a rehearing after the final judgment of the court
has been drawn up and settled; although as to mere clerical
errors and mistakes of form only, the order has been consid-·

ered amendable, so long as the remittitur remained under the control of the court.

We have referred to this case the more fully as the works treating of the practice in the house of lords are not accessible to the court, and perhaps not to the profession generally, and because the application is parallel to the one before the court. In the case of Thomas Jackson *et al. vs.* Wm. E. Ashton [10 Peters, 481], it was held that after a case has been dismissed for want of jurisdiction, the pleadings having been technically defective, the court will not, at a subsequent term, allow them to be amended and the case to be reinstated on the docket, as this would be, in effect, a reversal of the former decree; and that the court had no power over its decrees, after the term had passed, and the cause has been dismissed, or otherwise finally disposed of. [See Fontenbery *vs.* Foquer *et al.* 5 Arkansas Rep. 202.] On *Ex parte* Anderson Crenshaw [15 Peters, 119], the supreme court of the United States declared a judgment, rendered at a former term, null and void, and revoked their mandate issued to the circuit court, on the ground that the appellee, having not been cited, the case was not legally before the court, and the judgment, for want of jurisdiction, an absolute nullity.

This is the only exception to the practice in that high tribunal, of refusing, after the term is past, to re-examine and reform, or reverse, their judgments; and this was founded on their want of jurisdiction over the cause, and the consequent absolute nullity of the judgment. It will be unnecessary to refer to other authorities, as these abundantly prove that courts of dernier resort have no legal power to revise and materially modify their judgments rendered at a previous term.

One of the grounds of application in this case, and upon which it is supposed that we are not precluded from judicial cognizance of the former judgment, is, that the mandate of the court was dated one year after the time of its issue. This may be good ground for revoking the mandate and ordering another to issue, and might induce the court the more readily to correct clerical errors or mistakes, but would confer no authority to revise the merits of the cause,

or materially modify the judgment. The power of the court, for that purpose, ceases after the expiration of the term in which the judgment has been rendered. [Coke on Littleton, 260.] The record in this cause was filed in January, 1844, and a writ of *certiorari* was ordered at the succeeding July term of the court.[1] It was the duty of the appellant to have brought up a complete record in the first instance, and, at all events, it should have been perfected at the next term. Had the *certiorari* been disobeyed, a *mandamus* should have been applied for, and, on proper showing, would have been obtained. Subsequent to the judgment of this court, and previous to the application for a rehearing, the plaintiff seems to have had no difficulty in procuring a certified copy of the matter in which the transcript was supposed to be deficient. It may be proper to state that had this additional matter been sent up, the aspect of the cause would not have been altered, as the motion for a new trial was not made in due time, and if it had been, the circumstance would have been wholly immaterial so far as this application is concerned. The judgment of this court, in affirmance, did not, in any degree, depend upon the fact of whether a motion for a new trial had, or had not, been made. One of the defects for which the *certiorari* was obtained, viz.: the want of a certificate of notice to the defendant in error, was cured by his voluntary appearance.

The applicant seems to suppose that the action of this court, in awarding damages as for a frivolous appeal, was founded upon some improper representations of the counsel of the opposite party that the cause was brought here for delay. This supposition arises from a misapprehension of the practice

[1] When this opinion was prepared, I had no doubt that a writ of *certiorari* had been issued. It so appeared from the transcript of the entries of previous terms on the docket of 1848; and of this impression was the appellant or his attorney at the December term, 1846, as is evident from his motion on the 18th December, 1846, for an *alias certiorari*. There is a probability, however, that this may have been a mistake. The motion for a *certiorari* was made at the June term, 1844, and also a motion for a citation. The latter is marked granted, but the disposition of the former is not shown, at least by the entries on the docket, and the writ may probably not have issued. There was a subsequent application for a rehearing, in which the attention of the court was specially directed to the facts as stated, but that document is not before me; nor is any part of the record to be found in the clerk's office, and this note is written upon such facts as appear from the entries on the court docket.

of the court. Where there are no bills of exceptions, statement of facts, nor error suggested or apparent on the record, it is the duty of the counsel to suggest delay; and, even if that should be omitted, it is usual for the court, under such circumstances, to award the damages authorized by law in cases of frivolous appeal. The cause was for more than three years on the docket before the rendition of judgment. The grounds for reconsideration, viz.: the want of authority in the agent to confess judgment, and the incompetency of the court to enter the same for the cause stated, should have been assumed at the trial. The judgment was not a nullity, and could not be treated as such, nor could a reversal be expected, when no objections to its validity, or even to any alleged errors, were presented to the court by brief or otherwise. All these objections must now be regarded as having been adjudged and disposed of, and as no longer open to judicial examination or revision by this or any other tribunal. The application for a rehearing appears, upon the minutes and the docket of the court, to have been granted. But the opinion, delivered at the same time, shows clearly that the sole object of the order was, that the question of the power of the court to revise the judgments of a former term might be fully argued and considered.

Several applications of a similar character had been made, and it was deemed proper that a question, then for the first time presented, and involving such important considerations, should not be determined without full opportunity for investigation and deliberation. Under a rule of court, applications for a rehearing are directed to be presented at chambers, but in this case argument was desired in open court, and the order was made for this purpose, and to this extent only was it intended to operate. But from the entries it would appear that the application had been granted, and not that an argument only had been ordered, as was designed and intended by the court, and it is deemed advisable that the necessary correction should be made.

It is ordered, adjudged and decreed that the order granting

a rehearing in this case be set aside and reversed, and that the application for the same be refused; that the mandate formerly issued be revoked and annulled, and that a mandate do now issue, to the end that the judgment of this court may be observed and fully executed. .