**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald Louis MONROE,
Defendant–Appellant.**

No. 88–3017.

United States Court of Appeals,
Eleventh Circuit.

March 2, 1989.

---

Thomas S. Keith, Asst. Federal Public Defender, Pensacola, Fla., for defendant-appellant.

Randall J. Hensel, Asst. U.S. Atty., Pensacola, Fla., for plaintiff-appellee.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and HENDERSON, Senior Circuit Judge.

HATCHETT, Circuit Judge.

In this appeal, we reject the appellant's contentions that the district court erred by admitting hearsay statements, finding the evidence sufficient to convict, and ordering the forfeiture of real property. We affirm.

## FACTS

On July 14, 1987, the Air Products Chemical Plant in Pace, Florida, received an order placed by Bill Luke for a fifty-five gallon drum of methylamine, a key ingredient in the manufacture of methamphetamine, from Bill's Supply, Route 1, Seminole, Alabama. On July 17, 1987, Donald Louis Monroe and a person who identified himself as Earl Godwin arrived at the plant in a van to pick up the order. Monroe and Godwin were required to fill out a visitor's pass. Monroe signed his name as "D. Martin" and indicated that he represented Bill's Supply.

Godwin drove the van to the loading dock where an Escambia County Sheriff's Department deputy, posing as an employee of Air Products, assisted Monroe and Godwin in loading the fifty-five gallon drum of methylamine into the van. Monroe signed the bill of lading "D. Martin" which reflected the order of the fifty-five gallon drum of methylamine by Bill Luke of Bill's Supply, Route 1, Seminole, Alabama.

Law enforcement officers on the ground as well as in a helicopter observed the van travel to Monroe's residence on Bankhead Drive in Pensacola, Florida, where Monroe and Godwin unloaded the drum and placed it in a Quonset hut on Monroe's property. The total property located at 5225 Bankhead Drive encompasses approximately ten to eleven acres and is situated on a sandy drive where the Quonset hut, a mobile home, storage sheds, and a house are located. Also on the property is a large clay pit area containing abandoned cars, equipment, and other containers. Monroe also kept equipment for his machinery and demolition business on the property.

Based on the July 17, 1987 surveillance and other information, law enforcement officers sought and obtained a search warrant for Monroe's residence and the surrounding property at 5225 Bankhead Drive. On July 18, 1987, officers of the Drug Enforcement Administration (DEA) and the Escambia County Sheriff's Department executed the search warrant and seized numerous items.[1]

The chemical apparatus, including flasks, condensers, and tubing were found in the Quonset hut laboratory set up. In a metal storage shed behind Monroe's house, the officers found a Western Union money transfer application dated February 17, 1987, sent from Donald Moore, 5225 Bankhead Drive, Pensacola, Florida, and made payable to William Luke.

Officers found two keys in the kitchen of Monroe's house which fit the padlock securing the Quonset hut. Once inside the Quonset hut, officers discovered, among other things, a make-shift laboratory set up, that is, two three-neck round bottom flasks, two cold water condensers with tubing, a drying tube, a hot plate, fans for

---

1. Items seized from Monroe's house included:
 (1) a bottle of inositol, which is a common "cutting agent" for methamphetamine and other drugs;
 (2) a black grinder with powder residue on it;
 (3) eight full boxes containing the chemical acetaldehyde;
 (4) a sandwich bag box containing one clear plastic sandwich bag which contained forty small triangular packets of a brown powder substance;
 (5) a Kodak laboratory research and products catalog and a VWR Scientific Catalog, both reference books for selling chemicals and laboratory equipment;
 (6) the "Merck Index," a dictionary encyclopedia of chemical compounds containing a list of almost all known chemicals and their physical properties;
 (7) an address book and a rolodex, each containing, among other things, the name Bill Luke with a telephone number of (813) 543–5148;
 (8) a county occupational license issued by Escambia County to West Florida Demolition, Donald Moore, 5225 Bankhead Drive, Pensacola, Florida;
 (9) numerous packing lists and invoices from VWR Scientific Company and Eastman Kodak Company reflecting the shipment of various chemicals and laboratory equipment to Monroe's address under the names of Don Martin, Don Moore, or Don Morton;
 (10) an Air Products sticker attached to a material safety data sheet for methylamine, the sticker reflecting a weight of seven pounds, with the methylamine safety data sheet inscribed with the handwritten notation of "Bill's Supply, Residential Division, Route 1, Box 129, Seminole, Alabama";
 (11) a cashier's check customer receipt payable to the order of Air Products from Bill's Supply in the amount of $130.41, dated July 6, 1987;
 (12) a photostatic copy of a formula for making methamphetamine with some numbers written in ink on the front page and writing on the back of the last page;
 (13) the top flap of a cardboard box with an address label showing that it was from Air Products, the Escambia plant, addressed to "Sharpshooter's Gun Sales, 2103 East Gardenia Circle, North Fort Myers, Florida, Attention Cynthia Luke," reading the contents to be methylamine aqueous solution, flammable liquid; and
 (14) a legal size sheet of paper with numerous handwritten entries by Monroe for chemical apparatus including the description, reference number, and price corresponding to the same information on VWR Scientific Company invoices and packing receipts found in Monroe's master bedroom.

ventilation, and a tank of nitrogen with tubing attached. A DEA chemist described this as a "reflux set up." Officers found various chemicals, including the fifty-five gallon drum of methylamine obtained from Air Products the day before, now with a valve attached to gain access to its contents, and a canister of monomethylamine in the Quonset hut.

Officers also found several empty shipping boxes in the Quonset hut. One box had an address label indicating it had been shipped by the D.F. Goldsmith Chemical and Metal Corporation to William Luke Decorating Company, 2103 West Gardenia Circle, North Fort Myers, Florida, with writing on the box indicating it contained mercuric chloride at the time of shipping. Another empty box had an address label from Chemical Dynamics Corporation, South Plainfield, New Jersey, addressed to Bill's Pools, Inc., 2103 West Gardenia Circle, North Fort Myers, Florida. Officers found Monroe's fingerprints on the fifty-five gallon drum of methylamine, the two flasks in the laboratory set up, a box of acetaldehyde found in the house, and the box in which the forty triangular packets of a brown powdery substance were found.

## PROCEDURAL HISTORY

On September 17, 1987, the grand jury charged Monroe in a superseding indictment with conspiring to manufacture methamphetamine, in violation of 21 U.S.C. § 846 (Count I); attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846 (Count II); possessing cocaine in violation of 21 U.S.C. § 844 (Count III); and using or intending to use certain real property in a manner to commit or to facilitate the commission of the alleged violations, in violation of 21 U.S.C. § 853(a) (Count IV). In Count IV, the government sought the forfeiture of Monroe's real property.

During Monroe's jury trial, he raised hearsay objections to testimony of witnesses Steven Jernigan and Mary DeMoss. The court overruled the objections. At the conclusion of the government's case, Monroe moved for a judgment of acquittal on all counts. The district court denied this motion. Monroe's defense consisted of the testimony of the government's expert chemist who had testified during the government's case. The government did not present any rebuttal evidence.

The jury returned a verdict finding Monroe guilty as charged in Counts I and II, not guilty on Count III, and the property specified in Count IV subject to forfeiture. On December 30, 1987, the district court sentenced Monroe to ten years imprisonment under the provisions of 18 U.S.C. § 4205(b)(2) to run concurrently on Counts I and II. The district court also entered an order forfeiting the real property to the government. Monroe objected to the order of forfeiture on the grounds that the forfeiture, in addition to his sentence of imprisonment, would constitute cruel and unusual punishment in violation of the eighth amendment to the United States Constitution. The district court rejected this contention.

## CONTENTIONS

Monroe contends that the district court erred in admitting testimony from Steven Jernigan and Mary DeMoss that Bill Luke had made statements to them or in their presence which implicated Monroe and Luke in a plan to make methamphetamine. Monroe argues that Jernigan and DeMoss were not coconspirators, and that Luke was not trying to further any conspiratorial aims in making these statements; thus, the district court erred in ruling that Luke's statements qualified for admission under the coconspirator exception to the hearsay rule.

The government counters that the district court did not err in admitting this testimony. The government argues that the district court correctly ruled that Luke's statements qualified for admission under the coconspirator exception to the hearsay rule. The government asserts that Luke's statements to Jernigan, who was not a coconspirator at the time, were "in furtherance of the conspiracy" because Jernigan did join the conspiracy later. The government argues that the testimony of

Mary DeMoss regarding the statements she overheard Luke make with respect to Monroe's involvement in the conspiracy were likewise in furtherance of the conspiracy because they were meant to allay DeMoss's suspicions.

Monroe also contends that the district court erred in admitting testimony by Steven Jernigan regarding Cindy Luke's statements which implicated Monroe and Bill Luke in a plan to make methamphetamine. Monroe argues that Cindy Luke's statements were neither admissible under the coconspirator exception nor the "against penal interest" exception to the hearsay rule.

The government argues that the trial court correctly allowed the testimony of Steven Jernigan regarding these statements because the coconspirator exception to the hearsay rule allows statements which further a conspiracy. The government contends that the effect of these statements on Jernigan, in conjunction with Bill Luke's subsequent revelations followed shortly thereafter by Jernigan's involvement in the conspiracy, effectively furthered the conspiracy.

Next, Monroe contends that sufficient evidence did not exist to sustain his convictions on Counts I and II and the finding of forfeiture in Count IV. Monroe argues that the government's evidence, while showing suspicious circumstances, is too speculative to constitute proof beyond a reasonable doubt. The government counters that sufficient evidence existed to sustain Monroe's convictions on Count I and II and the jury finding that the property described in Count IV was subject to forfeiture.

Monroe contends that an order of criminal forfeiture is a form of punishment subject to scrutiny under the eighth amendment's proscription against cruel and unusual punishment. Monroe argues that the forfeiture of his property on which his home stands, in addition to his sentence of imprisonment, violates the eighth amendment because the total sentence is dispro-

portionate to the offenses for which he has been convicted. The government counters that the forfeiture of Monroe's real property did not constitute cruel and unusual punishment because the trial court correctly considered all the factors surrounding the case and Monroe's involvement therein, and correctly concluded that forfeiture of his property was not so disproportionate to his crimes as to constitute cruel and unusual punishment in violation of the eighth amendment.

## ISSUES

Monroe raises the following issues on appeal:

(1) whether the district court erred in admitting Steven Jernigan and Mary DeMoss's testimony about the Bill Luke statements;

(2) whether the district court erred in allowing Steven Jernigan's testimony regarding Cindy Luke's statements;

(3) whether sufficient evidence existed to sustain the convictions on Counts I and II and to support the finding in Count IV that his real property was subject to forfeiture; and

(4) whether the forfeiture of the real property, in addition to the ten-year sentence of imprisonment, constitutes cruel and unusual punishment in violation of the eighth amendment to the United States Constitution.

## DISCUSSION

### I. The Bill Luke Statements

Monroe contends that the trial court erred in admitting the Steven Jernigan and Mary DeMoss's testimony regarding certain statements Bill Luke made to them. The government counters that the trial court did not err in admitting this testimony, because the statements were made "in furtherance of the conspiracy." [2]

Fed.R.Evid. 801(d)(2)(E) states:

---

**2.** At trial, Jernigan testified:

THE COURT: Now, I'm getting confused because he's already testified that Luke said

something directly to him about Donald Monroe. Did Luke say anything to you directly about Donald Monroe getting involved?

(d) *Statements which are not hearsay.* A statement is not a hearsay if—

. . . .

(2) *Admission by party-opponent.* The statement is offered against a party and is

. . . .

(E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Monroe contends that the record does not support a finding that these statements were made "in furtherance" of any conspiracy between Luke and Monroe; thus, they do not come within the coconspirator exception to the hearsay rule. Monroe argues that Jernigan's testimony did not indicate that Luke attempted to get Jernigan to join the conspiracy or to act in any way to further it. Although Jernigan did subsequently assist Luke in ordering chemicals, Monroe contends that no evidence exists to indicate that Luke attempted to enlist Jernigan's aid at the time he initially told him about the plan to make methamphetamine.

[JERNIGAN]: Yes, he did tell me that him and Bill were in—Bill and Don was going to get together and use his place to make these drugs.

. . . .

[COUNSEL]: What was it, Did he make statements to you directly or did he not?
A. He made several statements to me directly but I can't recall all the statements.
Q. Well, I understand you may not recall word for word but I need to know what, in general, he said to you—
A. In general, he said that him and Don was trying to get together and make crystal meth. They was going to try to get these drugs. He was going to ship the drugs up to him, get him the drugs any way he could to make the drug with.
Q. Now, when he was saying this to you, was he trying to enlist your help in any way? Was he telling you, 'This is what we're doing; this is what I want you to do'?
A. No. He just told me what they were doing.
Q. He was just telling you what he was doing with Mr. Monroe?
A. Right. Correct.
Q. For your information?
A. Yes. Correct.

. . . .

Q. All right. I asked you—The last question, I think, before we went to the Bench was when if ever it came up about any conversations you had with Bill Luke about Donald

Monroe contends that no factual basis exists for finding that what DeMoss overheard Luke say about him was a statement in furtherance of a conspiracy. Monroe notes that DeMoss was not asked to join a conspiracy or act in any way to further a conspiracy. Further, Monroe argues that the testimony of Jernigan and DeMoss did not indicate that Luke's statements about Monroe were meant to allay any suspicions or fears that they may have had so as to further the objectives of the conspiracy. Monroe contends that the statements at issue were only casual admissions of culpability to people Luke had individually decided to trust.

The government concedes that neither Jernigan nor DeMoss were members of the conspiracy at the time Bill Luke made the statements. The government contends, however, that statements made by a coconspirator to a non-member of the conspiracy are admissible by meeting the "in furtherance of a conspiracy" standard when found to advance the objectives of the conspiracy. The government argues that Jernigan's

Monroe being involved in this thing, making methamphetamine?
A. Uh-huh (affirmative).
Q. Can you tell me if that ever occurred?
A. Well, they—he had told me before that he was worried about—he didn't want to make the stuff there itself because he didn't want to make it around the kids and this and that and he was scared. So he knew that Don Monroe had a big place up here, a lot of land that was kind of secluded off to itself. So he said he was going to try to get Don involved in it and help him out and have Don make it up here for him.
Q. Okay. Now, did you ever assist your brother-in-law, Bill Luke, in trying to get these chemicals to make this methamphetamine?
A. Yes, I did.
DeMoss testified:
Q. Were you ever at the house and answered the phone when it was Don Monroe and Bill agreed to talk to him?
A. Yes, sir.
Q. Did you ever overhear any conversation they had?
A. I heard bits and pieces.
Q. Could you tell what they were talking about from what you heard?
A. Drugs.
Q. What type?
A. Chemicals.

conversation with Bill Luke did lead to his becoming an active participant in the conspiracy between Luke and Monroe.

Whether a statement is "in furtherance of the conspiracy" is determined on the particular facts of each case. That determination is a finding of fact which may be overturned only if clearly erroneous. *United States v. Posner,* 764 F.2d 1535, 1537 (11th Cir.1985). The in furtherance of the conspiracy standard must not be applied too strictly, "lest we defeat the purpose of the exception." *United States v. James,* 510 F.2d 546, 549 (5th Cir.), *cert. denied sub nom., Vasquez v. United States,* 423 U.S. 855, 96 S.Ct. 105, 46 L.Ed. 2d 81 (1975); *see also United States v. Ayarza–Garcia,* 819 F.2d 1043, 1050 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). On review, we apply a liberal standard in determining whether a statement is made in furtherance of a conspiracy. *United States v. Santiago,* 837 F.2d 1545, 1549 (11th Cir. 1988). Statements made by one conspirator to a fellow conspirator identifying yet another conspirator for the purpose of affecting future dealings between the parties are held to be in furtherance of a conspiracy. *United States v. Caraza,* 843 F.2d 432, 436 (11th Cir.1988); *United States v. Patton,* 594 F.2d 444, 447 (5th Cir.1979). Also, when a conspirator provides information to his coconspirators necessary to keep them abreast of the conspiracy's current status, such statements are properly admitted as coconspirator declarations. *United States v. Pool,* 660 F.2d 547, 562 (5th Cir. Unit B 1981). Conversations made by conspirators to prospective coconspirators for membership purposes are also considered

acts in furtherance of the conspiracy. *United States v. Shoffner,* 826 F.2d 619, 628 (7th Cir.), *cert. denied sub nom. Strange v. United States,* — U.S. —, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987). Statements can be made in furtherance of a conspiracy if meant to allay suspicions or fears of others. *Posner* at 1538.

Based on this authority and a close examination of the contested testimony, we find that the district court did not err in admitting the testimony of Steven Jernigan and Mary DeMoss regarding the Bill Luke statements. These statements are admissible under the coconspirator exception to the hearsay rule because the statements were made in furtherance of the conspiracy.

## II. The Cindy Luke Statements

Monroe contends that the trial court erred in allowing the testimony of Steven Jernigan regarding Cindy Luke's statements. The government counters that the trial court correctly allowed this testimony.[3]

Prior to trial, Cindy Luke died. Monroe contends that Jernigan's testimony about Cindy's statements was inadmissible under both the coconspirator and "against penal interest" exceptions to the hearsay rule. Monroe argues that these statements are not admissible under the coconspirator exception because they were not made in furtherance of the conspiracy. Monroe asserts that these statements are also inadmissible under the "against penal interest" exception of Fed.R.Evid. 804(b)(3) which provides:

3. At trial, Jernigan, Cindy's brother, testified:
Q. Did you ever have any conversation with your sister regarding the manufacture of methamphetamine?
A. Yes. She approached me one day and said Bill had come up with a formula from somewhere for the making of crystal meth.
Q. Who was going to be making it?
A. Him and Don Monroe was supposed to get together. Don Monroe was supposed to make it at his place.
Q. Slow down. I'm referring first to the statement Cindy gave—when Cindy told you about it.

A. She said Bill was going to be making it.
Q. Where at?
A. They didn't say where at.
Q. They didn't know?
THE COURT: She just said they were—She wasn't helping?
THE WITNESS: No.
Q. Did Cindy tell you Bill had found a formula?
A. Yes, and was going to be making crystal meth, the methamphetamine.
Q. Did she say thing about profit or money?
A. No.

(b) *Hearsay exceptions.* The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(3) *Statement against interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interests, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

*See United States v. Alvarez,* 584 F.2d 694, 699–702 (5th Cir.1978); and *United States v. Harrell,* 788 F.2d 1524, 1526–27 (11th Cir.1986). Monroe contends that this exception is inapplicable because Cindy did not implicate herself in the plan to make methamphetamine. She only implicated her husband, Bill Luke.

The government concedes that Jernigan's testimony regarding Cindy Luke's statements did not qualify as statements against her penal interests. The government, however, argues that a reasonable inference can be drawn that Cindy Luke's comments to her brother were more than informative. Considered in light of her brother's subsequent conduct, the government argues that Cindy's statements may be construed as being in furtherance of the conspiracy because she expressed her knowledge of and her tacit approval of her husband's activities in which her brother subsequently actively assisted. The government contends that Cindy Luke's knowledge and apparent approval of Bill Luke's and Don Monroe's activities could be seen as statements made in furtherance of the conspiracy.

Whether a statement is in furtherance of the conspiracy must be determined on the particular facts of each case, with that determination overturned only if clearly erroneous. *Posner* at 1537. *See* Section I. We hold that the district court did not err in admitting the testimony of Steve Jernigan regarding Cindy Luke's statements because the statements may be construed to have induced Jernigan to join the conspiracy.

### III. Sufficiency of the Evidence

 Monroe contends that the evidence at trial was insufficient to sustain his convictions on Counts I and II and the finding in Count IV that his property is subject to forfeiture. In addition to the evidence found at Monroe's residence, and the testimony of Jernigan and DeMoss, a handwriting expert testified that Monroe had written "Merck index" reference numbers on the front page of the written formula for making methamphetamine. Monroe also wrote the words on the back of the last page; however, the handwriting expert concluded that Monroe had not written the actual formula. Additionally, the expert concluded that Monroe had written the list of chemical supplies with corresponding reference numbers and prices consistent with VWR Scientific Company invoices and packing receipts found in his master bedroom.

A DEA chemist assisted the agents in the search of the Quonset hut and the examination of the chemical apparatus set up inside. The chemist performed an analysis of the liquid substances collected from the flasks and jars found in the Quonset hut and determined that none were methamphetamine or any other controlled substance. The chemist also performed an analysis of the brown powdery substance contained in the forty triangular shaped packets and determined that those likewise did not contain methamphetamine or any controlled substance. The brown powdery substance did contain, however, among other things, inositol, which is a common cutting agent for drugs. The chemist testified that the substance in the packets, the powdery substance on the grinder found in the residence, and the liquids in the flasks in the Quonset hut all contained the identical non-controlled substance N,N dibenzyl methylamine. The chemist also testified that

the written formula found in the house was a formula for making methamphetamine, but that an essential ingredient utilized in the formula, P2P, was not found on Monroe's property. The chemist opined that considering the laboratory set up as he found it in the Quonset hut, the chemicals found on the property, and his analysis of the various liquids and solids, Monroe could not have been trying to make methamphetamine by the written formula found inside his residence.

The various numbers written on the front page of the formula, identified as being Monroe's handwriting, corresponded to certain reference numbers in the "Merck index." The reference numbers written by Monroe on the formula included those for the following chemicals: methylamine, methanol, mercuric chloride, ethyl ether, sodium hydroxide, and methamphetamine.

The chemist opined that Monroe could have been trying to make methamphetamine by what is known as the "Chewbakka Darth" method. This method requires mixing various chemicals in two separate reactions and then combining the end products of these two reactions to make methamphetamine. Monroe had all the essential ingredients for making methamphetamine by this method except for magnesium metal turnings. Without the magnesium metal turnings, the first reaction could not take place and consequently, the final reaction to methamphetamine could not take place. Pieces of aluminum foil found in one of the flasks could not be used as a substitute for magnesium metal turnings because of their different properties. The chemist further testified that the substance found in the flasks and in the forty packets —N,N dibenzyl methylamine, or N benzyl methylamine—could have been produced by bubbling methylamine into a liquid containing Alpha-chlorotoluene. On cross-examination, the chemist acknowledged that Monroe could have been making something other than methamphetamine.

In determining challenges to the sufficiency of evidence in a criminal case, we must determine whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt. *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.), *cert. denied sub nom. Gonzalez v. United States*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). To support a conviction for a conspiracy, the government must prove that two or more persons agreed to commit a crime, that the defendant knew of the agreement, and that he or she voluntarily became a part of the conspiracy. *United States v. Alvarez*, 837 F.2d 1024, 1027 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2003, 100 L.Ed.2d 234 and *cert. denied sub nom. Masquera–Herrera v. United States,* —— U.S. ——, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988).

Monroe concedes that the government's evidence, i.e., the items seized at his property, the laboratory set up, the interactions with the Lukes, and the testimony of the DEA chemist suggests that he conspired to and attempted to manufacture methamphetamine. Monroe, however, contends that suspicious circumstances do not equal proof beyond a reasonable doubt. Monroe emphasizes that no methamphetamine was found on his property and that he did not have all the essential ingredients to make it. Although he possessed a formula for making methamphetamine, Monroe argues that he could not have been using the formula to try to make methamphetamine because he lacked several essential ingredients.

Monroe contends that although the DEA chemist explained how he may have been trying to make methamphetamine by another method, no formula for this method existed and that the high unlikelihood of success without a formula, the lack of an essential ingredient, and the inconsistency between this method and how the substance in the flasks and packets could have been made, defeats the government's theory. Monroe argues that considering all the admissible evidence in the light most favorable to the government, no reasonable jury could find guilt beyond a reasonable doubt on Counts I and II, and that the finding of

forfeiture on Count IV must necessarily fall.

The test for determining whether a defendant may be convicted of an attempt was established in *United States v. Mandujano,* 499 F.2d 370 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

> First, the defendant must have been acting with the kind of culpability otherwise required for the commission of the crime which he is charged with attempting.... Second, the defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent.

*Mandujano* at 376.

The government contends that all the evidence found on defendant's property, even excluding the testimony of Jernigan and DeMoss, is sufficient to establish Monroe's intent to conspire with others to manufacture methamphetamine and that his acts were not consistent with a legitimate explanation of his conduct. Coupling the evidence with the statements by Jernigan and DeMoss, the government argues that Monroe's intent to conspire and attempt to manufacture methamphetamine is clearly established. *See United States v. Cusak,* 827 F.2d 696, 698 (11th Cir.1987).

We hold that the evidence, when viewed in the light most favorable to the government, enabled the trier of fact to find Monroe guilty beyond a reasonable doubt. Sufficient evidence existed to convict Monroe on Counts I and II as charged.

## IV. Forfeiture

Monroe contends that the forfeiture of his property in addition to his ten-year sentence of imprisonment constitutes cruel and unusual punishment in violation of the eighth amendment to the United States Constitution. Monroe cites two Ninth Circuit cases to argue that an order of criminal forfeiture is a form of punishment which must be scrutinized under the eighth amendment. *See United States v. Littlefield,* 821 F.2d 1365 (9th Cir.1987) (remand to district court to determine whether entire parcel of land, or only portion used for drug cultivation should be subject to forfeiture under 21 U.S.C. § 853) and *United States v. Busher,* 817 F.2d 1409 (9th Cir. 1987) (remand to district court to determine whether forfeiture of entire interest in several properties under 18 U.S.C. § 1963 was so grossly disproportionate to the offense committed as to violate the eighth amendment). In *Busher,* the Ninth Circuit held that an order of forfeiture must be examined under the test enunciated in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (the eighth amendment prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed):[4]

> In considering the harm caused by defendant's conduct, it is certainly appropriate to take into account its magnitude: the dollar volume of the loss caused, whether physical harm to persons was inflicted, threatened or risked, or whether the crime has severe collateral consequences, e.g., drug addiction.... *The eighth amendment prohibits only those forfeitures that, in light of all relevant circumstances, are grossly disproportionate to the offense committed.*

*Busher* at 1415 (emphasis added) (citations and footnotes omitted). In *Littlefield,* the Ninth Circuit stated:

> Before entering an order of forfeiture under section 853, the district court must therefore determine, consistent with *Busher,* that forfeiture of the entire property on which drugs were cultivated together with other punishments imposed is not so disproportionate to the offense committed as to violate the Constitution. In making that determination, the court is not limited to the factors specifically mentioned in *Busher,* but

---

**4.** We have limited *Solem v. Helm* to the extremely narrow issue of "whether the Eighth Amendment proscribes a life sentence without possibility of parole for a seventh *nonviolent* felony." *Seritt v. State of Alabama,* 731 F.2d 728, 732 (11th Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 433 (1984) (emphasis in original).

may take into account other relevant considerations, including the value of the illegal drugs cultivated on the property, and the nexus between the portion of the property actually used to grow the marijuana plants and the rest of the land. *Littlefield* at 1368 (citations omitted).

 Citing both *Busher* and *Littlefield*, Monroe contends that the forfeiture of his entire property in addition to his ten-year sentence of imprisonment violates the eighth amendment. Monroe's property consisted of his home and ten to eleven acres of land. The market value of the property was estimated to be $25,000 to $30,000. Monroe argues that we should consider the fact that no methamphetamine was actually produced on his property, and that this property is his only significant asset.

The government contends that the forfeiture of Monroe's real property did not constitute cruel and unusual punishment in violation of the eighth amendment. The district court rejected Monroe's argument that forfeiture of the entire property was grossly disproportionate and noted that the maximum penalties for the offenses involved in Counts I and II were each imprisonment for up to 20 years and a $1 million fine, and that 10 year concurrent sentences and the forfeiture of property worth up to $30,000 were not grossly disproportionate punishments.

Although the Ninth Circuit has recognized criminal forfeiture as a form of punishment subject to the eighth amendment's prohibition against cruel and unusual punishment, we decline to address this issue of first impression in this circuit (whether the eighth amendment applies to forfeitures). We decline because the sentence of 10 years concurrent on Counts I and II and the forfeiture of property worth up to $30,-000 would not be disproportionate to Monroe's crimes and would not implicate a constitutional violation nor require the application of the three-pronged *Solem* criteria. Consequently, we await a better factual setting in which to determine the eighth amendment issue.

## CONCLUSION

We hold that the district court did not err in admitting the testimony of Steven Jernigan and Mary DeMoss regarding Bill Luke's statements under the coconspirator exception to the hearsay rule, nor in admitting the testimony of Steven Jernigan regarding Cindy Luke's statements.

We hold that sufficient evidence existed to convict Monroe on Counts I and II. Finally, we affirm the forfeiture because no eighth amendment violation would exist under any existing analysis or any standard we would create.

AFFIRMED