United States Court of Appeals,

Eleventh Circuit.

No. 94-6643.

UNITED STATES of America, Plaintiff-Appellee,

v.

ONE PARCEL PROPERTY LOCATED AT 427 AND 429 HALL STREET,
MONTGOMERY, MONTGOMERY COUNTY, ALABAMA, WITH ALL APPURTENANCES AND
IMPROVEMENTS THEREON a/k/a G & G Grocery, Defendant,

George Thomas Jenkins, Claimant-Appellant,

Fleet Finance, Inc., Claimant.

Feb. 14, 1996.

Appeal from the United States District Court for the Middle
District of Alabama. (No. CV-91-A-1302-N), W. Harold Albritton,
III, Judge.

Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and JOHNSON,
Senior Circuit Judge.

TJOFLAT, Chief Judge.

I.

The defendant in this *in rem* proceeding is a parcel of real property located on Hall Street in Montgomery, Alabama. It is about 500 feet from the outdoor basketball courts of Houston Hills Junior High School and one fifth of a mile from the front door of the school itself. The entire property, which is valued at approximately $65,000, is owned by George Jenkins. There is one building on the property. In 1991, Jenkins ran a grocery store from one portion of the building and rented out the other portion.

In August 1991, an agent of the local district attorney's drug task force received a telephone call from a confidential informant who notified him that drugs were being sold at the grocery store. The task force then conducted two "controlled buys" using the

informant.  After each controlled buy, the informant produced a clear one-inch square bag, which contained a white, powder-like substance, and stated that the individual who had sold him the bag had pulled it from his pants pocket.  Each time, the agents field-tested the substance, identified it as one half of a gram of cocaine, and destroyed it.

On the strength of the information acquired during the two controlled buys, agents secured a warrant that authorized a search of the grocery store and any vehicle on the premises.  The search was conducted on August 30.  When they entered the store, the agents found George Jenkins standing behind a counter and cash register.  In his front right pants pocket, the agents found forty-five dollars and seven plastic one-inch square bags containing a white, powder-like substance.  They also found $800 in his wallet, as well as $108 and some .38 caliber bullets on a shelf behind the counter.  In a Chevrolet Blazer owned by Jenkins and parked on the premises, the agents found three hand-rolled cigarettes and a .38 caliber pistol.  Subsequent laboratory tests indicated that the bags taken from Jenkins's pocket contained a total of three grams of cocaine and that the cigarettes contained six tenths of a gram of marijuana.

In September 1992, Jenkins pled guilty in state court to the unlawful possession of cocaine, a felony under Alabama law, which carries a maximum sentence of ten years in prison and a maximum fine of $5000.  A charge of unlawful possession of marijuana was dropped as part of the plea agreement.

In October 1991, the United States filed this civil action *in*

*rem* for forfeiture of the entire parcel of real property, pursuant to section 511(a)(7) of the Controlled Substances Act, Pub.L. No. 91-513, Title II, 84 Stat. 1236, 1276 (1970), 21 U.S.C. 881(a)(7) (1994), which authorizes the forfeiture of real property "which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a violation of [the Controlled Substances Act] punishable by more than one year's imprisonment...."[1] In December 1991, Jenkins filed an answer in the forfeiture proceeding, as claimant to the property. After a bench trial, the district court ordered the property forfeited to the government. *See United States v. One Parcel of Property Located at 427 & 429 Hall St.,* 842 F.Supp. 1421 (M.D.Ala.1994). The court subsequently denied Jenkins's motion for a new trial. *See United States v. One Parcel of Property Located at 427 & 429 Hall St.,* 853 F.Supp. 1389 (M.D.Ala.1994).

Jenkins appeals, contending that: (1) the underlying offense was not "punishable by more than one year's imprisonment," as required by statute, and (2) the forfeiture constitutes an "excessive fine" in violation of the Eighth Amendment.[2]

## II.

Generally speaking, civil forfeiture is the forfeiture of

---

[1] The statute refers to a "violation of this title" and the code to a "violation of this subchapter," both of which are references to title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. No. 91-513, 84 Stat. 1236. Title II of that Act is the Controlled Substances Act. *See* Controlled Substances Act § 100, 84 Stat. at 1444, 21 U.S.C. § 801 note (1994).

[2] *See* U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

real or personal property to the state after that property is shown to be linked to a violation of the state's laws. As such, it has a long and varied history. The specific provision before the court today retains some of the characteristics of its antecedents—and those similarities will dispose of Jenkins's first argument. In one significant way, however, the provision departs radically from its precedents. The nature of this departure leads us to disagree with our sister circuit courts about the appropriate analysis of civil forfeiture under the Excessive Fines Clause, and it guides our disposition of Jenkins's second claim.

### A.

Some trace the roots of civil forfeiture to the Old Testament. *See* Exodus 21:28 (King James) ("If an ox gore a man or a woman, that they die: then the ox shall be surely stoned, and his flesh shall not be eaten; but the owner of the ox *shall be* quit.")[3] Blackstone, for example, noted the scriptural origin of one particular species of common law forfeiture—the deodand, according to which chattel was forfeit if it caused the death of a subject. *See* 1 William Blackstone, Commentaries *301.[4] In addition to the deodand, however, English common law recognized several other forms of forfeiture. *See, e.g.,* 2 William Blackstone, Commentaries *267-

---

[3]When used as an adjective, "quit" means "released from obligation, charge, or penalty." Webster's Third New International Dictionary 1867 (1993). Thus, the ox responsible for the goring was forfeit, and its owner subject to no (other) penalty.

[4]*See also* 1 Bouvier's Law Dictionary 844 (8th ed. 1914) (deodand was personal chattel "forfeited to the king to be distributed in alms by the high almoner "for the appeasing,' says Coke, "of God's wrath.' "). The word comes from the Latin *deo dandum,* "a thing that must be offered to God." *Id.*

287 (eight ways in which real property could be forfeit, including crime of the owner and bankruptcy).  At the time our Bill of Rights was ratified, the English common law recognized three kinds of forfeiture:  deodand, forfeiture upon conviction for a felony or treason, and "statutory forfeiture," pursuant to which an object would be forfeited if it were used in violation of the customs and revenue laws, which included, for example, the Navigation Acts of 1660.  *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680-83, 94 S.Ct. 2080, 2090-91, 40 L.Ed.2d 452 (1974);  *Austin v. United States,* --- U.S. ----, ----, 113 S.Ct. 2801, 2897, 125 L.Ed.2d 488 (1993).

Of these three, only statutory forfeiture became part of the American legal tradition.  *Austin,* --- U.S. at ----, 113 S.Ct. at 2807.  Indeed, during the colonial period, while adoption and use of forfeiture varied from colony to colony, every colony enacted some form of statutory forfeiture.  Matthew Q. Giffuni, Civil Forfeiture and the Excessive Fines Clause Following Austin v. United States, 31 Crim.L.Bull. 502, 506 (1995).  So, eventually, did the new federal government.  In 1789, the First Congress authorized forfeiture of ships (and their cargoes) that were involved in customs offenses.  Act of July 31, 1789, § 12, 1 Stat. 39;  *see also* Act of Aug. 4, 1790, §§ 13, 22, 27, 28, 1 Stat. 157, 161, 163;  *Austin,* --- U.S. at ----, 113 S.Ct. at 2707.  In the years since, Congress has authorized forfeiture to aid enforcement of many statutory schemes, including the navigation laws, food and drug laws, copyright laws, and antitrust laws.

In 1970, Congress enacted the Controlled Substances Act as

part of the Comprehensive Drug Abuse Prevention and Control Act and in it authorized civil forfeiture.  *See* Controlled Substances Act § 511, 84 Stat. at 1276, 21 U.S.C. § 881.  In 1984, Congress added the provision under which the Government proceeded in this case. *See* Comprehensive Forfeiture Act of 1984, Pub.L. No. 98-473, Title II, Chap. III, § 306, 98 Stat. 2040, 2050 (amending Controlled Substances Act § 511(a), 21 U.S.C. § 881(a)).  As noted, that section authorizes the forfeiture of real property used, or intended to be used, to commit, or to facilitate the commission of, a violation of the Controlled Substances Act punishable by more than one year of imprisonment.

Forfeiture pursuant to 21 U.S.C. § 881(a)(7) retains many characteristics of its ancestors.  Notably, "[a] civil forfeiture action is not an action in personam against the claimant of the property;  rather, it is an action in rem against the property itself." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1435 (11th Cir.1991) (en banc).  The property, and not its owner, is "guilty."  This is traditional *in rem* forfeiture.  Among its implications:  the acquittal, or even non-prosecution, of the owner on criminal charges is irrelevant as to the forfeitability of the property. *See The Palmyra,* 25 U.S. (12 Wheat.) 1, 15, 6 L.Ed. 531 (1827) ("[T]he proceeding  *in rem* stands independent of, and wholly unaffected by any criminal proceeding  *in person.");  The Brig Malek Adhel,* 43 U.S. (2 How.) 210, 233, 11 L.Ed. 239 (1844) ("The vessel which commits the aggression is treated as the offender, as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or

conduct of the owner."). A related implication: the government bears a lower burden of proof. To justify a forfeiture under section 881(a)(7), the government must merely establish that it had "probable cause" to believe that a crime punishable by a year or more has occurred. *United States v. Four Parcels of Real Property,* 941 F.2d at 1438.

At this juncture, Jenkins's first argument can be disposed of briefly. The Government proceeded *in rem* against property linked to a violation of the Controlled Substances Act. Jenkins claims that forfeiture is improper because the "underlying offense" in question is possession of three grams of cocaine (i.e., the cocaine found on his person on August 30), which is a misdemeanor punishable by "a term of imprisonment of not more than 1 year." Controlled Substances Act § 404(a), 84 Stat. at 1264, 21 U.S.C. § 844(a) (1994). To be sure, the forfeiture provision requires that the underlying drug offense be one punishable by *more than* one year's imprisonment. But Jenkins has misidentified the underlying offense. The government premised the forfeiture on possession *with the intent to distribute,* aggravated in this instance by the property's proximity to a junior high school. The minimum imprisonment for this felony is fifteen months in prison. [5] That Jenkins was only convicted of simple possession, and that the government might not have been able to satisfy the high burden of criminal prosecution with respect to intent to distribute,[6] are

_____

[5]*See infra* part II.B.

[6]Jenkins argues that the field testing (rather than laboratory testing) and subsequent destruction of the cocaine purchased during the controlled buys mean the government has no

simply irrelevant.  In this respect, the theory of civil forfeiture has changed very little.

B.

Civil forfeiture under the Controlled Substances Act, however, diverges from its roots in a very fundamental way.  Specifically, Congress has provided an "innocent owner" defense:  "[N]o property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner."  21 U.S.C. § 881(a)(7).  There was no innocent-owner defense at common law, although there was some discretion to mitigate based on the moral innocence of the party incurring the penalty.  *See Calero-Toledo,* 416 U.S. at 683 n. 27, 94 S.Ct. at 2091 n. 27.  The innocent-owner defense included in section 881(a)(7) strongly suggests that Congress intended to punish persons intentionally involved in drug trafficking.  *See Austin,* --- U.S. at ---- - ----, 113 S.Ct. at 2810-11 ("These exemptions serve to focus the provisions on the culpability of the owner in a way that makes them look more like punishment, not less.").  The legislative history of the section confirms the punitive nature of the provisions.  *Id.* at ---- - ----, 113 S.Ct. at 2811, *citing* S.Rep. No. 98-225, 98th Cong., 2d Sess. 191 (1983).  This brings us to Jenkins's second argument, that the forfeiture of

---

evidence admissible in a criminal trial pertaining to intent to distribute.  We make no comment on the merits of this argument.  We simply note that the dispositive question is whether the government had "probable cause" to believe the crime occurred, not whether it could prove Jenkins's guilt *beyond a reasonable doubt* in a criminal trial.

his real property constitutes an "excessive fine" in violation of the Eighth Amendment.

It has been established that the Excessive Fines Clause of the Eighth Amendment applies to *in rem* civil forfeiture proceedings under 21 U.S.C. § 881(a)(7). *See Austin,* --- U.S. at ----, 113 S.Ct. at 2812. The *Austin* Court declined, however, to articulate a test for determining whether a particular forfeiture violates the Excessive Fines Clause. *See id.* ("Prudence dictates that we allow the lower courts to consider that question in the first instance.") In his concurring opinion, Justice Scalia contended that the appropriate test is an "instrumentality" test that focuses on "the relationship of the property to the offense" or, in other words, a test that asks, "Was [this relationship] close enough to render the property, under traditional standards, "guilty' and hence forfeitable?" *Id.* at ----, 113 S.Ct. at 2815 (Scalia, J., concurring in part and concurring in the judgment). The majority simply responded that it would "not rule out the possibility that the connection between the property and the offense may be relevant ... in determining whether [a] forfeiture ... [is] excessive." *Id.* at ---- n. 15, 113 S.Ct. at 2812 n. 15.

The tests laid out by lower courts since *Austin* generally fall into two categories. Some have followed Justice Scalia's suggestion and applied an instrumentality test, focusing on the *use* of the *property* in the commission of the illegal act, asserting that this test is the only way to preserve the "guilty property fiction" of traditional *in rem* forfeiture. *See, e.g., United States v. Chandler,* 36 F.3d 358 (4th Cir.1994), *cert. denied,* ---

U.S. ----, 115 S.Ct. 1792, 131 L.Ed.2d 721 (1995). A few have applied a proportionality test, the core of which is a comparison of the *severity* of the forfeiture with the *seriousness* of the crime. *See, e.g., United States v. One Parcel of Real Property Located at 461 Shelby County Rd. 361,* 857 F.Supp. 935 (N.D.Ala.1994). Many, including the district court in this case, have combined the two approaches in some fashion. *See, e.g., United States v. Premises Known as Rural Route No. 1 Box 224,* 14 F.3d 864 (3d Cir.1994); *United States v. Real Property Located in El Dorado County at 6380 Little Canyon Road,* 59 F.3d 974 (9th Cir.1995). *See generally* Sarah N. Welling & Medrith Lee Hager, Defining Excessiveness: Applying the Eighth Amendment to Civil Forfeiture After *Austin v. United States,* 83 Ky.L.J. 835 (1994-1995).

Courts and commentators rejecting a proportionality test have relied heavily on what they perceive to be a retreat from proportionality review in Cruel and Unusual Punishments Clause jurisprudence.[7] *See, e.g., United States v. Chandler,* 36 F.3d at 365. Reliance on the Cruel and Unusual Punishments Clause cases for an interpretation of the Excessive Fines Clause is, however, inappropriate.[8] The clauses are distinct. *Alexander v. United*

---

[7] Proportionality review under the Cruel and Unusual Punishments Clause was laid out by a five-justice majority of the Supreme Court in *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Many contend that eight years later, in *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Court "retreated" from its earlier holding. We make no comment, of course, on the dispute; the Cruel and Unusual Punishments Clause is not before us.

[8] The Excessive Fines Clause has received little attention from the Supreme Court. The first decision interpreting the

*States,* --- U.S. ----, ----, 113 S.Ct. 2766, 2775, 125 L.Ed.2d 441 (1993). We conclude that the appropriate inquiry with respect to the Excessive Fines Clause is, and is only, a proportionality test. We rely on: (1) the reasoning used by the *Austin* Court in its conclusion that the clause applies; (2) the plain meaning of the clause; and (3) the history of the clause.

First, the *Austin* Court reasoned that the Excessive Fines Clause applies because forfeiture under section 881(a)(7) "constitutes "payment to a sovereign as punishment for some offense.' " --- U.S. at ----, 113 S.Ct. at 2812 *quoting Browning-Ferris Indus. v. Kelco Disposal Inc.,* 492 U.S. 257, 265, 109 S.Ct. 2909, 2915, 106 L.Ed.2d 219 (1989). Specifically, forfeiture is tied to "the commission of drug offenses." *Id.* at ----, 113 S.Ct. at 2811. And the inclusion of an innocent-owner defense reveals Congress's intent "to punish only those [i.e., those *owners* ] involved in drug trafficking." *Id.* In other words, section 881(a)(7) is designed to, and does, punish *individuals* involved in drug trafficking. It is primarily for this reason that the instrumentality test is inappropriate. When the Eighth Amendment's Excessive Fines Clause, which constrains the power of the sovereign to punish, comes in to play, it necessarily protects the *person punished,* i.e. the owner.[9]

---

provision was handed down in 1989. *See Browning-Ferris Indus. v. Kelco Disposal Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). The Framers, too, paid much less attention to it than they did to other clauses.

[9]The instrumentality test adopted in part by the district court is required by the statute itself, but not by the Eighth Amendment. Section 881(a)(7) authorizes forfeiture of real property "which is used, or intended to be used, in any manner or

Second, the Excessive Fines Clause on its face prohibits fines which are "excessive"—i.e. fines that are (in amount) just too much. And because the clause protects the individual punished, this turn of phrase necessarily implies a comparison of the amount of the fine with the acts of the individual. This is simply a logical reading of the provision in question: excessive fines are not to be imposed. *See Harmelin v. Michigan,* 501 U.S. 957, 967, 111 S.Ct. 2680, 2687, 115 L.Ed.2d 836 (1991) (Scalia, J. and Rehnquist, C.J.) (rejecting a proportionality review under the Cruel and Unusual Punishments clause in part because "the drafters of the [English] Declaration of Rights did not explicitly prohibit "disproportionate' or "excessive' punishments"); *see also id.* at 1009, 111 S.Ct. at 2709 (White, Blackmun, and Stevens, JJ., dissenting) ("The language of the Amendment does not refer to proportionality in so many words, but it does forbid "excessive' fines, a restraint that suggests that a determination of excessiveness should be based at least in part on whether the fine imposed is disproportionate to the crime committed.").

Finally, the historical antecedents of our Excessive Fines

part" to facilitate a violation of the Controlled Substances Act. 21 U.S.C. § 881(a)(7). The government must present evidence furnishing a reasonable ground for belief that a *substantial connection exists* between the property to be forfeited and the illegal activity. *See United States v. $121,100.00 in U.S. Currency,* 999 F.2d 1503, 1505 (11th Cir.1993) (§ 881(a)(6)); *United States v. Approximately 50 Acres of Real Property Located at 42450 Highway 441 N. Fort Drum,* 920 F.2d 900, 902 (11th Cir.1991) (§ 881(a)(6)). *See also United States v. Parcel of Land and Residence at 28 Emery St.,* 914 F.2d 1, 3-4 (1st Cir.1990) (§ 881(a)(7); *United States v. One Parcel of Real Estate Located at 7715 Betsy Bruce Lane,* 906 F.2d 110, 112-13 (4th Cir.1990) (§ 881(a)(7)); *United States v. Premises Known as 3639-2nd St., N.E.,* 869 F.2d 1093, 1096-97 (8th Cir.1989) (§ 881(a)(7)).

Clause themselves required proportionality review.  Magna Charta, for instance, contained several provisions regulating the amount of amercements, fines which were imposed at the discretion of the court for illegal conduct.[10]  *See* Magna Charta § 20 ("A freeman shall not be amerced for a small fault but *after the manner of the fault;* and for a great crime  *according to the heinousness of it*....") (emphasis added); *Harmelin,* 501 U.S. at 968-69, 111 S.Ct. at 2687-88 (Scalia, J., and Rehnquist, C.J.);  Massey, *supra* note 10, at 1251.  By the time of the Glorious Revolution, it was clear that Magna Charta afforded no protection from extravagant "fines," which were typically criminal penalties,[11] but which were also levied ruthlessly on enemies of James II and Charles II.  Massey, *supra,* at 1253, 1263.  Accordingly, those who drafted the 1689 English Declaration of Rights (and its statutory counterpart, the Bill of Rights), included an excessive-fines clause:  "excessive Baile ought not to be required nor excessive Fines imposed nor cruell and unusuall Punishments inflicted."  1 Wm. & Mary, 2d Sess., ch. 2, 3 Stat. at Large 440, 441 (1689), *cited in Solem v.*

---

[10]Amercements were an "all-purpose monetary sanction used to penalize both criminal and civil wrongdoing."  Even before Magna Charta, a writ *de moderata misericordia* would lie if the penalty "was disproportionately large in relation to the offense." Calvin R. Massey, The Excessive Fines Clause and Punitive Damages:  Some Lessons From History, 40 Vand.L.Rev. 1233, 1259 (1987).

[11]One justification for the Magna Charta's failure to address the proportionality of fines may have been the "well established common-law tradition invalidating excessive fines." Massey, *supra,* at 1254 n. 124.  What we today call a "fine," of course, is not the same as what a seventeenth century Englishman called a "fine" or what he called an "amercement."  Each, however, involved payment to a sovereign and each was linked to the commission of a wrong.

*Helm,* 463 U.S. 277, 285, 103 S.Ct. 3001, 3007, 77 L.Ed.2d 637 (1983); *see also* 4 Blackstone *378-379.[12]  The provision "explicitly addressed the issue of fines, while it implicitly reaffirmed ancient rights with respect to amercements."  Massey, *supra,* at 1255.  William of Orange's acceptance of the English throne in 1689 was directly linked to his acceptance of the Declaration of Rights.  *Id.* at 1249-50.  And in an often recounted case, three months after the Bill of Rights was adopted the House of Lords reviewed the imposition of a thirty thousand pound fine on the Earl of Devon for an "assault and battery upon Colonel Culpepper."  *See Weems v. United States,* 217 U.S. 349, 376, 30 S.Ct. 544, 552, 54 L.Ed. 793 (1910); *Solem,* 463 U.S. at 285, 103 S.Ct. at 3007 (1983).  The House of Lords declared the fine "excessive and exorbitant, against Magna Charta, the common right of the subject, and the law of the land."  *Earl of Devon's Case,* 11 State Trials 1354, 1372 (1689).

In sum, the principle that "fines" are not to be "excessive" (i.e. "out of proportion") was well rooted in English law when our country came of age.  And of course, the Eighth Amendment "was *based directly on* Art. I, § 9, of the Virginia Declaration of Rights (1776), authored by George Mason.  He, in turn, had *adopted verbatim* the language of the English Bill of Rights."  *Solem,* 463 U.S. at 286 n. 10, 103 S.Ct. at 3007 n. 10 (both emphases added).

These observations lead to the conclusion that application of the Excessive Fines Clause to civil forfeiture under 21 U.S.C. §

---

[12]*See* Massey, *supra,* at 1264 ("It was this unwelcome flexing of royal authority that undoubtedly was the immediate political target of the Declaration of Rights.").

881(a)(7) requires a review of the proportionality of the fine imposed.[13] That is, a court must ask: Given the offense for which the owner is being punished, is the fine (imposed by civil forfeiture) excessive? While the core of proportionality review is a comparison of the severity of the fine with the seriousness of the underlying offense, it would be futile to attempt a definitive checklist of relevant factors. The relevant factors will necessarily vary from case to case. See *United States v. Monroe,* 866 F.2d 1357, 1366 (11th Cir.1989) (" "The [E]ighth [A]mendment prohibits only those forfeitures that, in light of all relevant circumstances, are grossly disproportionate to the offense committed.' ") (quoting *United States v. Busher,* 817 F.2d 1409, 1415 (9th Cir.1987)).

We turn to the present case. On the one hand, the real property in question is worth approximately $65,000. Moreover, Jenkins has never been convicted of a violation of the Controlled Substances Act, and it is undisputed that the legitimate businesses that he ran off the property (i.e. his own store and renting out the other portion of the building) were his primary source of livelihood. On the other hand, Jenkins's property was forfeited on the strength of possession with the intent to distribute three grams of cocaine within five hundred feet of a junior high school. In 1991, under the United States Sentencing Commission Guidelines, this was a Level 14 offense, punishable by fifteen to twenty-one

---

[13]*See also United States v. One Single Family Residence Located at 18755 N. Bay Rd.,* 13 F.3d 1493, 1498 (1994) (finding *in rem* forfeiture pursuant to 18 U.S.C. § 1955 to be the "imposition of a disproportionate penalty" in violation of the Excessive Fines Clause).

months in prison. *See* United States Sentencing Commission, *Guidelines Manual* at §§ 2D1.1, 2D1.2, 5A (1990). A Level 14 offense also results in a mandatory fine ranging from $4000 to $40,000. *See id.* at § 5E1.2. Furthermore, putting aside the sentencing guidelines, the totality of the circumstances underscores the seriousness of the offense. Jenkins was found with marijuana, large amounts of cash, bullets, and a .38 caliber gun, and he was quite close to a junior high school. Given a possible sentence of twenty-one months in prison and a $40,000 fine, and given the additional factors at work in this case, we conclude that forfeiture of a $65,000 piece of property does *not* violate the Excessive Fines Clause.

## III.

The district court applied a two-step test to measure the excessiveness of the fine, a test which emphasized instrumentality analysis, but which included proportionality review. While we affirm the judgment of the district court (ordering the property forfeited to the government), we do so solely on the strength of proportionality review, which is all that the Excessive Fines Clause requires. The judgment of the district court is

AFFIRMED.